SUSAN PATTON et al., appellants,

*v.*

EDWARD HOPE, executor, respondent.

1. Where the attestation clause of a will shows a compliance with the statutory requirements as to the execution of the will, the burden of proof of showing that the testatrix did not declare the instrument to be her will, is on the caveators.

2. The mere fact that the testatrix could neither read nor write does not, in the absence of any evidence of imposition on her, render it necessary for the proponent to prove that she knew the contents.   The execution of the paper according to law raises a presumption in such a case, as it does when the testator is not illiterate, that she understood its contents.

Appeal from decree of Hudson orphans court, admitting the will and codicil thereto of Bridget McDonald to probate.

*Mr. C. S. See,* for appellants.

*Mr. J. Garrick,* for respondent.

THE ORDINARY.

Bridget McDonald, of Jersey City (who was, from 1839 to 1875, wife of Peter Dalton, from whom, in the latter year, she was divorced in this state on her application, and thereupon resumed her maiden name), made her will on the 18th of November, 1879, and a codicil thereto on the 23d of December following.   By the will, she gave to her executor (Edward Hope)

Patton v. Hope.

$1,500, in trust, to pay $1,000, with interest from the date of her death, to Susan Patton (her granddaughter), daughter of James and Susan Patton, of Philadelphia, when and provided she should arrive at the age of thirty years; and in case of her death before attaining to that age, to pay the money and interest to the pastor of the Roman Catholic Church of the parish in which the legatee should live at the time of her decease; $200 thereof to be used by the pastor for masses for the repose of the souls of the testatrix and the legatee, and the balance to be used for the poor of the parish; to pay $500, with interest from the testatrix's death, to her granddaughter, Mary Jane McWilliams, of New York city, when and provided she should attain the age of thirty years, with like disposition of the legacy in case of lapse by reason of the legatee's death before attaining to the age of thirty years, as in the case of the legacy to Susan Patton. To Bridget, Catharine and Mary McDermott, all of Wisconsin, she gave $400 apiece. To Mary McDermott, just mentioned, she gave her watch, rings and breastpins, in case she, the testatrix, should possess them at her decease, and also $300 for the erection of a headstone at the grave of the legatee's mother in Watertown, in Wisconsin. To John McDermott, of Wisconsin, she gave $300. To Susan, Sarah, James and Rosa McDonald, all of the city of

NOTE.—I. *Query,* as to the validity of a gift for masses, *West* v. *Shuttleworth,* *2 Myl. & K. 684; Atty.-Gen.* v. *Fishmongers Co., 2 Beav. 151, 5 Myl. & Cr. 11; Blundell's Trusts, 30 Beav. 360; Heath* v. *Chapman, 2 Drew. 417; Dougherty's Estate, 12 Phila. 70; Power's Estate, 35 Leg. Int. 68; Rhymer's Appeal, 93 Pa. St. 142; 24 N. Y. Reg. 81.* See *Yeap Cheah Neo* v. *Ong Cheng Neo, L. R. (6 P. C.) 381.*

II. A will may be void in part and valid as to the residue, as where a legacy is set aside for undue influence by the legatee, *Trimelstown* v. *D'Alton, 1 Dow. & Cl. 85; Guillamore* v. *O'Grady, 2 Jones & Lat. 210; Haddock* v. *Trotman, 1 F. & F. 31; Billinghurst* v. *Vickers, 1 Phillim. 187; Morris* v. *Stokes, 21 Ga. 552; Welsh's Case, 1 Redf. 239; Florey* v. *Florey, 24 Ala. 241; Harrison's Appeal, 48 Conn. 202;* or a part was not read over to the testator, *Hippesley* v. *Horner, T. & R. 48, note;* or part interpolate d*surreptitiously. Powell* v. *Monchett, 6 Madd. 216; Morrell* v. *Morrell, L. R. (7 P. D.) 68; Oswald's Goods, L. R. (3 P. & D.) 162;* see *Iddings* v. *Iddings, 7 S. & R. 111;* or one devise is void for illegality, *Salmon* v. *Stuyvesant, 16 Wend. 321; Radley* v. *Kuhn, 28 Hun 573; Barbour* v. *De Forest, 61 How. Pr. 181; Wyndham* v. *Chetwynd, 1 Burr. 429; Abercrombie* v. *Abercrombie, 27 Ala. 489;* see *Tee* v. *Ferris, 2 K. & J.*

Patton v. Hope.

New York, she gave $100 apiece. To Ann McDonald, widow, she bequeathed $200, to be divided between Thomas and Mary Ann McDonald, as she, Ann McDonald, should think proper. To Rose McDonald, of Brooklyn, in New York, she gave $100 and her household goods and wearing apparel, and she then gave to her executor the sum of $1,000, in trust, that out of it he should pay her debts and funeral expenses, and if it should be more than sufficient for that purpose, to pay the balance to the pastor of the Catholic parish of St. Peter's, in Jersey City; three-fourths of that balance to be used for masses for the repose of her soul and those of her deceased sons, Edward and Peter Dalton, and the rest for the poor of the parish. The witnesses to the will were Dr. J. J. Prendergast, Mr. Hope, the executor, and Hugh P. Reilly (now deceased), the lawyer by whom it was drawn. By the codicil she gave her burial lot in Calvary Cemetery, Brooklyn to the before-mentioned James McDonald, and ratified and confirmed the will. The testatrix had had eight children. There were but three of them living when the will was made—Mary McWilliams, Susan Patton and Alice, a single daughter. Her five sons were all dead. When the will was made and up to her death, she was deserted by all her daughters, all of whom had seriously offended her. Mrs. McWilliams testifies that she and her mother parted not very kindly in September, 1877, and that she never saw her mother afterwards until she was dead. She

---

*357;* or the scrivener omitted the amount of a legacy, *Comstock* v. *Hadlyme, 8 Conn. 254; Freeman* v. *Freeman, 8 Vin. Abr. Devise § 51; Eatherly* v. *Eatherly, 1 Coldw. 461; Snyder* v. *Warbasse, 3 Stock. 463; Sessoms* v. *Sessoms, 2 Der. & Bat. Eq. 453;* see *Downhall* v. *Catesby, Moore 356; Whitlock* v. *Wardlaw, 7 Rich. 453; Langston* v. *Langston, 8 Bligh (N. S.) 167;* or one gift be void for uncertainty, *George* v. *George, 47 N. H. 27; Kerr* v. *Dougherty, 59 How. Pr. 44;* or certain premises do not pass under one devise, *Coulson* v. *Holmes, 7 Cent. L. J. 446.*

Whether any question as to the *construction* of a will can prevent its probate, *Cobb's Case, 49 Cal. 599; Prater* v. *Whittle, 16 So. Car. 40.*

As to the jurisdiction of chancery to set aside a part of a will for fraud, after the entire will has been probated, *Allen* v. *McPherson, 1 H. L. C. 191; Perrin* v. *Perrin, 19 Grant's Ch. 259;* see *Johnson* v. *Glasscock, 2 Ala. 318.*

A decree of a probate court approving a will not appealed from, does not render valid void bequests in the will, *Bent's Appeal, 35 Conn. 523, 38 Id. 34.*—REP.

Patton v. Hope.

lived in the city of New York and her mother in Jersey City. The testatrix died in the spring of 1881. The cause of the unkind feeling between them was, Mrs. McWilliams says, her mother's treatment of Alice. From 1868 Susan, though she lived in Philadelphia, never visited her mother, and never was at her mother's house, except to attend the funerals of her brothers Edward and Peter. When her mother went to Philadelphia to see her in 1871 or 1872, she was compelled to stay at the house of a friend. She remained two or three days, but Mr. Patton would not allow her to come to his house. Mrs. Patton had then been living in Philadelphia three or four years, she says, and she went there in 1868. So that in 1871 or 1872 the testatrix was denied admittance to her daughter's house. Patton says, in reference to this occurrence, that he had determined never to have anything to do with her, and that his family should not; that they would be scandalized by having anything to do with her; that he would have been ashamed to have anybody know she had anything to do with them; that he forbade her ever to come into his house; that she came there afterwards and tried to make some compromise; that she came to Philadelphia and stopped at the house of a friend; that he would not let her come to his house; that he never wished to see her, living or dead; that if he were dying he would not let her look at his dead body if he could help it, and he certainly would not look at hers; that she had disgraced him to the utmost of her power; that she had tried to get his wife to get a divorce from him.

As to Alice, the proof is that there was intensely unfriendly feeling on her part towards her mother. There is no evidence that the estrangement between the mother and the daughters was due to mental aberration or insane prejudice on the part of the former. Nor is there any proof whatever of unsoundness of mind in the testatrix. On the other hand, the codicil shows that there was no ground for questioning her capacity. Mr. Hope testifies that he considered her a woman of clear mind, and adds that he thought her very clear-minded in making a bargain, and that he always thought so. Dr. Prendergast, who was her physician and had known her and had dealings with her for ten or

twelve years, says he thought she was a " very shrewd kind of a woman," and says he had not the remotest suspicion of anything being wrong with her, and that he never questioned her mental capacity at any time.   Mrs. Simpson, who knew her well for two years before her death, says she was a woman of very strong mind ; that she was the best business woman in Jersey City that she ever met, and was, she thought, able to assert her rights and protect herself, so far as a woman was able to do so, and that she did so to the last month of her life.   Mrs. Costigan, who knew her well for many years, says that she wishes she had half as good a mind as the testatrix had ; that she was as fine a woman and as dear a soul as she ever met; that she was a woman of good judgment, and that if she, the witness, wanted any advice she would go to her for it.   Mrs. Huber, who knew the testatrix well, says she was possessed of a clear mind ; that she does not think that there was anything the matter with her mind, and that she thinks she was of perfectly sound mind and a woman of good judgment.   Catharine Norton, who knew her from the 5th of October, 1880, until her death, testifies that she was of sound mind up to her death.   Jacob Z. Marinus, sergeant of police (he has been chief of police and police commissioner), who knew her for ten or twelve years at least, says that his opinion is that she was a very prudent, wise, religious woman—a woman of extraordinarily good judgment; that he does not think that there was a saner woman in Jersey City or anywhere else ; that she was quite a nice, pleasant-talking woman, nothing bad about her, and that he never saw anything about her to indicate insanity.

That she did not intend to give any of her property to her daughters is evident from her conversation with her friend, Mrs. Burch.   The latter says that towards the end of the testatrix's life, she said to the testatrix that she hoped she would not forget her, the testatrix's, children, to which the testatrix replied, " That will do ; that is enough ; I don't want anything more to do with them ; " that the witness said she hoped the testatrix would not forget her grandchildren, to which she replied, " No ; them that I like I will see to."   The testatrix having been at

the execution of the will and codicil, possessed of testamentary capacity and laboring under no insane delusion as to any one who had, by nature, claims upon her bounty, and there being no evidence of fraud, it remains to consider only the question whether the will was properly executed.

There were three witnesses to the will, Dr. Prendergast, Mr. Hope, the executor, and Mr. Reilly. As before stated, the last named is dead. The attestation clause certifies that the will was signed, published and declared by the testatrix to be her last will and testament, in the presence of the witnesses who were present at the same time, and subscribed their names thereto as witnesses in the presence and at the request of the testatrix. It will be seen that it shows a compliance with the requirements of the statute on the subject of the execution of wills. The caveators insist that the testatrix did not declare that the instrument was her will. But the attestation states the contrary, and the effect of that statement is to throw the burden of proving that the declaration was not made, on them. They have not proved it. Nor have they attempted to do so. From the testimony of the surviving subscribing witnesses, it appears that Mr. Reilly, the lawyer who drew the will, superintended its execution, and that the witnesses all knew from testatrix's statements then made that she was executing the instrument as her will. The question was not asked at the trial whether she made the declaration. But, as before stated, in the absence of proof to the contrary, the statement of the attestation clause is conclusive. The certificate of attestation to the codicil is the same as that annexed to the will, and what has been said in reference to the execution of the will on the subject of the declaration, is equally applicable to the codicil, except that Mr. Reilly did not superintend the execution of the latter.

But it is urged that, seeing that the testatrix could neither read nor write, it should appear that the instruments were read over to her before execution. The rule on the subject is, that when the testator is unable to read or write, it must be made to appear that the will was read over to him, or its contents fully made known to him. *Day* v. *Day, 2 Gr. Ch. 549.* But the

mere fact that a testator is illiterate will not, in the absence
of any evidence to induce the court to suspect that he may have
been imposed upon, render it necessary for the proponent of a
paper purporting to be his will, and which he has executed as
such, to prove that he knew the contents of the instrument when
he executed it.    The execution of the paper according to law
raises a presumption in such a case as it does when the testator
is not illiterate, that he understood its contents, and the pro-
ponent is not called upon to produce affirmative proof of knowl-
edge of the contents until fraud, practice or undue influence is
charged and supported by at least some evidence. *Vernon v.
Kirk, 30 Pa. St. 218*.    In this case there is no evidence of any
imposition, nor of any attempt at deception, nor of any influence
upon the testatrix, nor of any evil practice or fraud, nor of any
circumstance which would lead the court to suspect that the will
may not be her true last will and testament.    On the other
hand, all the evidence on the subject leads to the conclusion that
she fully understood both of the instruments.    They were drawn,
not by any person interested, but by her own lawyer and by her
own procurement.    When the will was executed, Mr. Reilly,
according to Dr. Prendergast's testimony, said, in his presence,
that she was acquainted with its contents and that it was neces-
sary for her to request the witness to sign it.    The codicil she
had in her own possession when she executed it, and when she
produced it for execution she stated that it was a codicil to her
will.    It refers to the will by its date, and ratifies and confirms
it.    The decree of the orphans court should be affirmed.