## Case No. 3,971.

### DOLNER et al. v. The MONTICELLO.

### POTTER et al. v. SAME.

[1 Holmes, 7.][1]

Circuit Court, D. Massachusetts. Sept., 1870.[2]

COLLISION BETWEEN STEAM AND SAIL — FOG — "MODERATE SPEED" — FOG-HORN — MUTUAL FAULT.

1. The act of 1864, c. 69, art. 10 (13 Stat. 60), requires a fog-horn to be sounded on a sailing-ship under way, when there is fog enough by day to shut out the view of the sails or hull, or at night the lights, of vessels within the range of the sound of the horn.

2. "Moderate speed," within the meaning of the act of 1864, c. 69, art. 16, requiring steam-ships to go at moderate speed in a fog, is a speed sufficiently moderate to enable the steamer, under ordinary circumstances, when approaching another ship so as to involve risk of collision, seasonably and effectually to slacken her speed, or, if necessary, stop and reverse.

[Cited in The Cambridge, Case No. 2,334; The City of Panama, Id. 2,764; The Pennsylvania, 12 Fed. 917; The Rhode Island, 17 Fed. 558; The State of Alabama, Id. 853; The Alberta, 23 Fed. 812; The Nacoochee, 28 Fed. 467.]

3. The lookout of a steamer at sea in calm weather, running at night in a fog not less than eight miles an hour, discovered the port light of a schooner having little headway, about two hundred feet distant and about a point on the starboard bow. The steamer's helm was ported, and orders given, before collision, first to slow, and afterwards to stop, the engine. The steamer struck the port side of the schooner, cutting her down below the water-line, and kept on her course for a considerable distance. No fog-horn was sounded on the schooner. Held: 1. That the steamer was in fault for porting, instead of starboarding, her helm. 2. That the steamer was also in fault for going at more than the moderate speed directed by the act of 1864, under such circumstances. 3. That the schooner was in fault for not sounding a fog-horn, as required by the act of 1864.

4. Both vessels being in fault, and the faults of both contributing to cause the collision, the damages were divided.

Admiralty appeals from the district court of Massachusetts in cases of collision. The libellants [Harold Dolner and others] in the first case were the owners of the schooner Phebe; in the second [Gilbert Potter and others], the owners of the cargo on board the Phebe; and claimed, respectively, to recover the value of the schooner and cargo, alleging that the Phebe "was run down and sunk by the fault of the steamer Monticello, whereby the schooner and cargo were to-

[1] [Reported by Jabez S. Holmes, Esq., and here reprinted by permission.]

[2] [Affirming Case No. 9,739.]

tally lost." The claimants contended that the collision was caused by the fact that there was a thick fog at the time, which made it impossible to see the schooner's lights, and by the neglect of the persons in charge of the schooner to sound a fog-horn, as required by law. In the district court, the damages were divided, on the ground that both vessels were in fault [Case No. 9,739]; and the parties appealed.

C. T. & T. H. Russell, for libellants.

John C. Dodge, for claimants.

SHEPLEY, Circuit Judge. The schooner Phebe, on the sixth day of March, left the port of Havana, Cuba, laden with a cargo of fruit, bound for the port of New York. Proceeding on her voyage, about ten o'clock on the night of the 11th of March the schooner was from thirty to forty miles south by west from Cape Lookout, with a light wind from the north-east, sailing on her larboard tack, heading east by south, and close-hauled upon the wind. The breeze was so light that the schooner had scarcely any headway, barely enough to give her steerage, and was nearly becalmed. The port watch was upon the deck and on the alert, and the regulation lights were properly displayed. The course of the schooner was not changed until after the collision.

The steamer Monticello being on a voyage from Boston to Savannah, and running not less than eight miles an hour, the man on the lookout on the steamer discovered the red or port light of the Phebe, about one point on the steamer's starboard bow. The wheel of the steamer was thereupon put to port and orders given, first to slow, and afterwards to stop, the engine. The steamer struck the schooner upon the port side, between the fore rigging and the cat-head, cutting her down below the water-line. By the force of the collision the schooner was thrown round so as to head about west-south-west, and the steamer kept on her course for a considerable distance. The schooner immediately filled with water, capsized, and was totally lost, with all her cargo, tackle, apparel, and furniture.

When the steamship struck the schooner, four of the schooner's crew jumped on board of the steamer. The remainder of the crew were taken off by a boat from the steamer, when the schooner, having capsized, was all under water except her starboard rail. The testimony introduced by the libellants and that on the part of the claimants thus far is not in conflict.

The claimants contend that the collision was caused by the facts that there was a thick fog at the time, which made it impossible to see the schooner's light sooner than it was seen; and that the persons on board of, and in charge of, the schooner neglected to sound a fog-horn, as by law they were bound to do, or to give any timely notice, by any other means, of her presence. The an-

swer, also alleges that the schooner did not carry lights of the strength and brilliancy required by law. This last point was not much relied upon in the argument, and is not supported by the proofs in the case. The libellants claim that, at the time the steamship was descried from the schooner, she was about a mile distant and under good headway, and ought to have, and easily could have, changed her course and passed the schooner.

There is much conflict in the testimony as to the density of the fog, and as to the distance at which the lights of either vessel could be seen from the other. Some of the witnesses speak of the night as merely "misty," or "hazy," and "smoky;" while others testify that the fog was so dense that "you couldn't see any thing;" others, according to their respective powers of description or accuracy of recollection or force of imagination, testifying to every intermediate state, from impenetrable fog and murky darkness as stated by one witness, which is "nothing more than dew, and a kind of smoke over the water," as described by others. Taking into consideration the fact that all the witnesses substantially admit the existence of a fog, mist, or haze of some kind, and also those undisputed facts in the case where the unpremeditated acts of parties at the time speak louder than words,—such as the request of the mate of the steamer to the master to keep the whistle blowing, when he was going out a short distance in the boat to rescue the crew of the schooner, the suddenness with which the lights of the respective vessels glanced out of the fog when first visible from the deck of the other vessel, and many other equally convincing facts and corroborating proofs not necessary to recapitulate,—there can be no difficulty in arriving at the conclusion that the fog was sufficiently dense to shut out the view of the lights of the schooner within the range of the limit of the sound of the fog-horn; in other words, that, at the time immediately preceding the collision a fog-horn could have been heard at a greater distance from the schooner than the regulation lights of the schooner could have been seen.

Chapter 69, art. 10, Act 1864 (13 Stat. 60), provides that, "whenever there is a fog, whether by day or night, the fog-signals described below shall be carried and used, and shall be sounded at least every five minutes; viz.: Steamships under way shall use a steam-whistle placed before the funnel, not less than eight feet from the deck. Sailing-ships under way shall use a fog-horn. Steamships and sailing-ships, when not under way, shall use a bell."

The Phebe was under way, and no fog-horn was sounded that night. If she had been stationary, she was without any bell; and it is doubtful if she had any fog-horn on board capable of being used when under way.

Although we do not find that this omission to comply with the requirements of the statute was the cause of the collision, we are not prepared to say that it did not contribute in some degree to bring it about. The testimony entirely fails to convince us that the hailing or shouting of the men on the schooner was any substitute for the horn required by law. The schooner's men did not commence to hail the steamer until after the steamer's lights were seen through the fog. The statute contemplates that a horn could be heard at a greater distance than the lights could be seen. To admit this hailing as a valid substitute for the fog-horn, under the circumstances of this case, would be to repeal the plain provisions of the statutes. The true rule in relation to the density of a fog which would require the use of the statute fog-horn, is well stated by the learned district judge in his opinion in this case: "By day, there must be fog enough to shut out the view of the sails or hull; or by night, of the lights within the range of the horn, whistle, or bell."

It would require very clear and positive proof that the omission to comply with the statute did not in any way contribute to the collision to authorize a court to say that the vessel thus neglecting was free from fault, especially in a case like this, where the vessel had made no suitable provision for giving the signal by a horn when under way, or by a bell when stationary, neither horn nor bell being in readiness for use.

The officers and crew of the schooner testify, without an exception, that the steamer's lights were seen at a distance of a mile. The lights of the steamer were very brilliant, and in a night like this, when the fog was more dense near the surface of the water, the mast-head light of the steamer could undoubtedly be seen at a much greater distance than the lights of the schooner. Opinions as to the distance of an object seen through a fog upon the water are always more or less unreliable, and a more satisfactory result as to the intervening space between two vessels approaching each other is attained by ascertaining their rate of progress and the time intervening between the time when first seen and the time of collision. Applying this test to the evidence, while it would show that the steamer's lights were not probably seen at the distance of a mile from the schooner, they were seen at such a distance that if the fog-horn had been then at hand and immediately sounded it would have been heard from the deck of the steamer before the lower and less brilliant lights of the schooner were perceptible from the steamer.

Although a steamer is by law required to keep out of the way of sailing-vessels, this does not authorize a sailing-vessel to needlessly or wantonly put herself in danger, or by her own negligence to deprive the steamer of any reasonable opportunity of

being informed of the position and course of the sailing-vessel, so as to enable those in charge of the steamer to avoid a collision by changing or arresting the steamer's course when necessary.

It is contended on the part of the libellants that the steamer was in fault in not sounding her steam-whistle, and in not having a lookout on each bow. The evidence is very contradictory on these points; and, for the reasons given below, it becomes unnecessary to decide them, especially as it does not appear if there were any omissions of duty in these respects that they contributed in any way to cause the collision. It is also alleged against the steamer that she was running too fast, and that there was fault in porting the helm of the steamer when it should have been put to starboard.

"When two ships, one of which is a sailing-ship, and the other a steamship, are proceeding in such directions as to involve risk of collision, the steamship shall keep out of the way of the sailing-ship." 13 Stat. 60. "When two sailing-ships are meeting end on, or nearly end on, so as to involve risk of collision, the helms of both shall be put to port, so that each may pass to the port side of the other." The rule is the same in the case of two ships under steam meeting; but not so when a ship under steam and a sailing-ship are proceeding in such directions as to involve risk of collision. In such a case, the sailing-ship is required "to keep her course" (Act 1864, c. 64, art. 18); and the ship under steam is "to keep out of the way of the sailing-ship," which she may do by stopping and reversing, or by putting her helm to port or to starboard: the statute, while requiring her under such circumstances "to slacken her speed, or if necessary stop and reverse," not enacting any rule requiring the helm to be put either to port or to starboard, merely requiring the vessel under steam to keep out of the way of the vessel under sail, leaving her free to adopt the most practicable and seaman-like mode of doing it, by stopping and allowing the sailing-vessel to pass, or by passing across her bows or under her stern, or on either hand, so that she keeps out of her way. Some of the experts examined in the case do not appear to understand that the rule of porting the helm, applicable to the case of two vessels both under sail and of two vessels both under steam, meeting each other end on, or nearly so, is not applicable to the case of such a meeting where one is under sail and the other under steam.

But nine witnesses—all of whom have been masters of ocean steamers, and whose opinions are certainly entitled to great consideration—all agree that, supposing a steamer proceeding at the rate of eight or ten knots an hour in a fog, the weather being calm, suddenly makes a red light close to, or about two hundred feet off, and bearing one-half point on her starboard bow, she ought to put her helm to starboard. Some of them adding, very properly, to the answer, "Put my wheel hard to starboard," the words, "and stop the engine."

Their opinion is sustained by the result in this case. The order was to port the helm, and the steamer fell off a point and a half at least, and struck the schooner at or very near the fore rigging. Now, taking the shortest distance, and suppose the vessels only two hundred feet apart at the time the helm was ported, and it is mathematically demonstrable upon the facts in this case, that, if the helm had been put to starboard and the steamer had come up a point and a half, she would have passed in advance of the schooner and cleared her. The schooner was making little headway. Some of the experts think the steamer would have cleared her by keeping her course. All the experts examined in the district court concurred in putting the steamer in fault in porting when she should have starboarded. Although some expert testimony is introduced in this court not heard before the district judge, the great preponderance of proof in this court is to the same effect.

The claimants contend, that if, sitting calmly in judgment on this case, and looking at it in the light of results,—a light which, before the event, the mate could not have,—it should appear that on the whole the chances of avoiding the schooner would have been better if the helm had been starboarded, it does not follow that the mate of the steamer was culpably negligent because he ported the helm. They contend that he had no time for deliberation; and the fact that the steamer was in such dangerous proximity as to compel him to hasty action, was the fault of the schooner. This position was presented in an argument of great clearness and power. It would be tenable, we think, if we were satisfied of one of the premises; that is, that the fact that the steamer was in such dangerous proximity as to compel hasty action, was the fault of the schooner alone. But we do not think the steamer can be considered free from fault in this respect.

A steamship, when approaching another ship so as to involve risk of collision, is bound to slacken her speed, or, if necessary, to stop and reverse. When in a fog, she is required to go at a moderate speed. "A moderate speed" is a term used in the statute not capable of any definition which would apply it to a speed of any given number of miles an hour alike under all circumstances. What would be moderate speed in the open sea would not be allowable in a crowded thoroughfare or a narrow channel. And under the same circumstances, in other respects, the speed should be the more moderate according as the fog is more dense. The only rule to be extracted from the statute and a comparison of the decided cases is, that the duty of going at a moderate speed in a fog

requires a speed sufficiently moderate to enable the steamer under ordinary circumstances, seasonably, usefully, and effectually to do the other things required of her in the same clause of the statute; viz., to slacken her speed, or, if necessary, to stop and reverse.

In the case of The Batavia, 40 Eng. Law & Eq. 25, Sir John Patterson said, "At whatever rate the steamer was going, if going at such rate as made it dangerous to any craft which she ought to have seen, she had no right to go at such a rate. At all events, she was bound to stop, if it was necessary to do so, in order to prevent damage being done to the craft in the river." Dr. Lushington, in the case of The Juliet Erskine, 6 Notes Cas. 633, says, "If in a dark night the vessel was proceeding at such a rate that those on her deck had not sufficient command over her so as to avoid all reasonable chance of accident, then that was too expeditious a rate, because it was the duty of those who navigate the commercial marine of the country to take care that they do not, for the sake of expedition, injure the property of other people." In the case of The Jane v. The Great Eastern, carried to the judicial committee of the privy council on appeals, reported in 11 Law T. (N. S.) 5, the superior court say, "The witnesses on both sides state that it was a dark night, hazy weather, and that a drizzling rain was falling. Their lordships do not mean to lay down any rule, beyond that expressed in the regulations themselves, as to the occasion where a steam-vessel is bound to moderate her speed, or as to the rate which, in the circumstances described in the evidence, she ought not to exceed; but their lordships are of opinion that it is the duty of the steamer to proceed only at such a rate of speed as will enable her, after discovering a vessel meeting her, to stop and reverse her engines in sufficient time to prevent any collision from taking place." Holt's Rule of the Road, 167–180.

Considering that the steamer was proceeding at a rate of not less than eight miles an hour, "with the throttle open" and the "cut off" on the engine, and that under such circumstances, according to the testimony of her assistant-engineer, she could not be brought to a full stop under four or five minutes, and at a less distance than half a mile, it can hardly be considered that the dangerous proximity of the steamer to the schooner, which involved the risk of hasty action when the schooner was first seen, was not, at least in part, the fault of the steamer.

Under these circumstances, both vessels being in fault, and the faults of both contributing to cause the collision, the damages must be divided.

Decree of district court affirmed, with costs.