CASE 98—PETITION ORDINARY—OCTOBER 6.

# Lasch, by &c. v. Stratton, &c.

APPEAL FROM JEFFERSON CIRCUIT COURT, LAW AND EQUITY DIVISION.

1. MASTER AND SERVANT—DEFECTIVE MACHINERY—CONTRIBUTORY NEGLIGENCE.—The servant in all cases has the right to rely upon the assurances of the master as to the safety of machinery operated by the servant where the attention of the master has been called to it, and especially when the master's duty and opportunity rendered him more capable of judging of the condition or suitableness of the machinery than the servant. And the servant has a right to rely upon the assurances of the agent of the master as to the safety of the machinery operated by him. In this case it appears that the servant was a minor, and that he had noticed before the injury that other employes had previously been injured by the machine which he was operating, and that he notified the foreman who had charge of the factory that he feared the machine was dangerous, but was assured by the foreman that it was not dangerous, and that he continued to operate the machine relying upon such assurance; and it is held that he had a right to so rely upon such assurances, and was not guilty of contributory negligence.

KOHN, BAIRD & SPINDLE FOR APPELLANT.

1. Scienter can be shown by past behavior and reported history. Findley v. Bauer, 37 Cent. Law Jour., 452.
2. Peremptory instruction is improper unless both the facts and all the inferences clearly show that there is no liability. Peltier v. R. R., 16 Ky. Law Rept., 500; Wright v. R. R., 14 Ky. Law Rept., 788; Romwell v. Dilworth, 2 Atl. Rept., 356.
3. Where the servant bows his judgment to the opinion of the master, or complains and is induced to remain in the employ, he does not assume the risk. Brice v. L. & N. R. R., 10 Ky. Law Rept., 526; L. & N. R. R. v. Foley, 15 Ky. Law Rept., 17; L. & N. v. Shivell, 13 Ky. Law Rept., 903; Ritt v. L. & N. R. R., 9 Ky. Law Rept., 307, Flahiff v. R. R., 9 Ky. Law Rept., 398; Breckinridge v. Hicks, 15 Ky. Law Rept., 143; Lawrence v. Hagenmeyer, 14 Ky. Law Rept., 506; McDowell v. R. R., 10 Ky. Law Rept., 209: Sullivan v. Bridge Co., 9 Bush, 88;

Lasch, by &c. v. Stratton, &c.

Quaid v. Cronwall, 13 Bush, 601; Bogenschutz v. Smith, 84 Ky., 330; Needham v. L. & N. R. R., 85 Ky., 423; Daley v. Schaaf, 28 Hun., 314; Jones v. R. R., 43 Mo., 398; Lake Superior Co. v. Errickson, 39 Mich., 492; Jones v. R. R., 49 Mich., 573; Patterson v. R. R., 76 Penn. St., 392; Schlacker v. Ashland, 50 N. W., 839; Dorsey v. Construction Co., 42 Wis., 596; Hamilton v. Coal Co., 18 S. W. Rept., 977; Shearman & Redfield on Negligence, vol. 1, secs. 211, 212; R. R. v. Walters, 91 Ala., 435; Dumont v. Stone, 25 Atl., 1097; Kane v. R. R., 128 U. S., 339; R. R. v. Meyers, 123 U. S., 296; Sherman & Redfield on Negligence, sec. 126; Thompson on Negligence, vol. 2, 1009; Wood Railway Law, vol. 3, secs. 371, 1460; Wood's Master & Servant, sec. 352.

4. Unless there is an exact knowledge of both defect and danger there is no presumption of risk. Thorpe v. Mo. Pac. R. R., 2 S. W. Rept., 3; O'Driscoll v. Faxon, 31 N. E. Rept., 685; Sanborn v. Flume, 11 Pac., 710; Wuotilla v. Duluth Lumber Co., 33 N. W. Rept., 553; Mahoney v. Dore, 30 N. E. Rept., 366; Harrison v. R. R., 27 Pac., 728; Jacques v. Great Falls, 22 Atl., 553; Mooney v. Lumber Co., 28 N. E. Rept., 352; Cook v. R. R., 24 N. W. Rept., 312; Russell v. R. R., 20 N. W. Rept., 147.

ALFRED SELLIGMAN, O'NEAL & PRYOR, AND PHELPS & THUM FOR APPELLEES.

1. The servant by continuing his employment after discovering the danger, assumes the risk and can not hold the master liable. Bogenschutz v. Smith, 84 Ky., 338; Kelly v. Barber Asphalt Co., 93 Ky., 364; Brice v. L. & N. R. R., 10 Ky. Law Rept., 526; L. & N. R. R. v. Foley, 94 Ky., 224; L. & N. R. R. v. Shivell, 13 Ky. Law Rept., 903; Ritt v. L. & N. R. R. Co., 9 Ky. Law Rept., 307; Flahiff v. Railroad Co., 9 Ky. Law Rept., 398; Breckinridge v. Hicks, 94 Ky., 366; Sullivan v. Bridge Co., 9 Bush, 88; Needham v. L. & N. R. R., 85 Ky., 427; Baird Bros. v. Deering, 13 Ky. Law Rept., 271; Amer. & Eng. Enc. of Law, vol. 14, p. 842; Lawrence v. Hagemeyer & Co., 93 Ky., 593.

2. The servant is bound to keep his eyes open and guard against dangers that the proper use of his senses and faculties would have disclosed. Baird v. Deering, 13 Ky. Law Rept., 271; Kelly v. Barber Asphalt Co., 93 Ky., 364 and cases cited there.

3. The facts show that appellant's means of knowing and his own knowledge were superior to that of all other persons connected with this case.

(43)

JUDGE GUFFY DELIVERED THE OPINION OF THE COURT.

This action was instituted in the Jefferson Circuit Court by the appellant against the appellees, seeking to recover judgment for damages sustained by him while in the employ of the appellees. The petition reads as follows:

"The plaintiff, Fred Lasch, who sues here by Mary A. Lasch, his next friend, for petition states that he is now, and was at the time hereinafter mentioned, an infant, under the age of twenty-one years and a citizen and resident of Louisville, Jefferson county, Ky.; that heretofore, to-wit, August 10, 1893, for compensation then and there promised and agreed by the defendants, W. A. Stratton and Henry Terstegge, who were then, and are now, and were at the times hereinafter mentioned, partners, trading and doing business under the firm name and style of Stratton & Terstegge, this plaintiff was employed by the said defendants to operate and conduct a certain machine or contrivance, then and there owned and operated by the said defendants in their said workshop in Louisville, Ky., for the purpose of cutting certain pieces of tin and other goods and wares then and there manufactured and worked and operated upon by the said defendants; that by the negligence of the said defendants, their agents, servants and employes, charged with the duty, by the said defendants to keep the said machine upon which this plaintiff was then and there required by the said defendants to work, as aforesaid, in order and condition, the said machine was allowed and permitted and caused to become and be, and the said machine was then, greatly out of repair and condition, and to be dangerous to one operating and working upon or about

the said machine, especially in this:  That a certain con-
trivance or appliance or part of said machine, designed and
used for the purpose of keeping stationary and at rest a
certain die, to-wit, a sharp instrument used for the purpose
of cutting tin then and there fed to said machine, was, by
the negligence of said defendants, their agents, servants
and employes, as aforesaid, allowed, permitted and caused
to be out of order, and defective in such a manner and degree
and extent that the said machine and the said knife, die
and sharp instrument, as aforesaid, were thrown in motion,
and operation when the same should have been stationary
and at rest, and that by reason of the said negligence of the
said defendants, their agents, servants and employes, as
aforesaid, and by reason of the moving and operation of
said die, sharp instrument and knives, as aforesaid, when
the same should have been stationary and at rest, this
plaintiff was then and there caught by the said sharp in-
strument, die and knife, and the same were thrown down and
upon his hands and fingers, and from the said operation
and movement and throwing down of the said die, sharp
instrument and knife, as aforesaid, this plaintiff then and
there lost his right index finger, and the same was cut off
and dissevered, and then and there lost and was deprived of
a portion of the left index finger, and suffered great pain
and anguish of body and mind, and was thereafter rendered
sore and sick and for a long period of time was deprived
and prevented from attending to his lawful and necessary
affairs, and continued for a long time to suffer great pain,
physical and mental, and to be sick and sore, and has been
permanently deprived of the full use of the index finger of

his right hand and of the index finger of his left hand; that at the time of the occurrence, as aforesaid, and of the receiving of the injuries, as aforesaid, this plaintiff did not know and had no notice of, and had no means of knowing or ascertaining, that the said machine, as aforesaid, was defective or out of order or condition and dangerous; that the defective and dangerous condition of said machine, and that it was out of order at the time of the occurrence, as aforesaid, and of the injuries inflicted upon this plaintiff, as aforesaid, the defendants, their agents, servants and employes, as aforesaid, charged with the duty of keeping said machine and contrivance in repair and condition, knew, or should have known, and could have known by the exercise of ordinary care and diligence, that the said machine and contrivance was out of repair, defective and dangerous to be operated, and that this plaintiff could not at said time have ascertained, by the exercise of ordinary care and diligence, that said machine was out of repair, defective and dangerous to be operated, and that from the said injuries so received this plaintiff has been damaged in the sum of $10,000, no part of which has been paid by the defendants. Wherefore, he prays judgment against the defendants in the sum of $10,000, for his costs herein expended and for all proper relief."

The answer traverses all the averments of the petition showing a right to recover, and in the second paragraph thereof pleaded contributory negligence on the part of the appellant. At the conclusion of plaintiff's testimony the court, on motion of the appellee, instructed the jury peremptorily to find for the defendant, which was accordingly done,

and judgment rendered dismissing appellant's petition, and his motion for new trial having been overruled he prosecutes this appeal.   The sole question presented for decision is whether the peremptory instruction should have been given. The testimony introduced is as follows

Fred Lasch, called in his own behalf, being duly sworn, testified as follows:

"Q. You are Fred Lasch, the plaintiff in this action?"

"A. Yes, sir."

"Q. How old are you?"

"A. I am twenty years old."

"Q. When were you twenty?"

"A. On the 27th of June, 1893."

"Q. You are now going on twenty-one years of age, and will be twenty-one next June?"

"A. Yes, sir."

"Q. In 1893, were you employed by the defendants, Stratton & Terstegge?"

"A. Yes, sir."

"Q. When were you employed by them?"

"A. I could not say.   Mr. Snyder says I was working there a year and a half."

"Q. What were you employed to do?"

"A. Working around the shop, working on tin work."

"Q. Last August, when you were injured, what were you engaged to do?"

"A. To run that machine."

"Q. What machine?"

"A. The press that I had my fingers cut off on."

"Q. What were you earning a week at that time?"

"A. Nine dollars."

"Q. What kind of a press is that and for what is it used, and for what part of the business conducted by Stratton & Terstegge is the press used which you were operating in August last?"

"A. For cutting out fruit cans."

"Q. How is it operated?"

"A. By clutches in a wheel that is worked by a treadle."

"Q. By what kind of motive power?"

"A. They use a gas engine."

"Q. How large a machine is it?"

"A. A great, large machine, about seven feet high."

"Q. Of what material is it constructed?"

"A. It is supposed to be good, solid iron and steel."

"Q. What were your duties in working upon or at that machine?"

"A. I was put there to run the machine and cut out these fruit cans. I did my work on them."

"Q. Was that all you were employed to do?"

"A. Yes, sir."

"Q. Did you have anything to do with looking after the machine, to keep it in repair or see that it was in repair or anything of that kind?"

"A. No, sir."

"Q. Please explain, if you can, as intelligently as you can, how this machine is operated?"

"A. This machine is run by cutting out the tin by placing your foot on the treadle, and the clutch falls out and catches the shaft and throws the die down. As quick as you take your foot off the die goes up. When you put your foot on

the treadle this here thing jumps out and catches the shaft
and throws it down, and you have time to take your foot off.
I was running that machine and cutting out those fruit
cans when I was hurt."

"Q. Was the motive power for this machine from a shaft
overhead?"

"A. Yes, sir; a pulley."

"Q. Explain to the jury what kind of an instrument that
thing you call a clutch is?"

"A. That clutch is a piece of iron inside the wheel, a
spring placed inside of it; it is hollowed out with a spring
inside."

"Q. In each wheel?"

"A. In the main wheel on the machine.   There is only
one large wheel on the machine."

"Q. And this connects with the pulley overhead?"

"A. Yes, sir."

"Q. Explain to the jury how the clutch is thrown out of
this wheel; what starts it in motion?"

"A. This is hollowed out, and it has a large spring about
four inches long inside, and when you place your foot on the
treadle that clutch falls out.   This wheel has sorter of a
shoulder on it, and when the clutch comes out it catches
that and throws it in motion, and when it comes down it
makes a sort of a click, gives sorter of a signal and no more
than that signal is given your foot must be taken up."

"Q. Explain what kind of an instrument the die is, wheth-
er it is short or blunt?"

"A. The die is supposed to be steel and is square.   It is
hollowed out on the inside.   It is a square die, a little

larger than that piece of tin, an inch and a half thick and thirteen and a half or thirteen and three-quarters inches long, and I do not know exactly the other way, but about four inches and a half."

"Q. Is it sharp or not; has it a sharp edge to it?"

"A. It fits close together here so to cut that tin. The tin is as thin as paper, some of it."

"Q. How is the tin fed in?"

"A. The tin is fed straight down this way."

"Q. Is there a table on which the tin is shoved under the die?"

"A. Yes, sir; and it has two pins sticking up in the back to place the tin against, so as it won't go too far down. That is called the gauge."

"Q. When the die is up, how far is it from this table or place upon which the tin is slid under the die?"

"A. It stands four and a quarter inches."

"Q. When the foot is off the treadle, what is the position of the die?"

"A. The die stands still about four and a half inches from the table."

"Q. It stands four and a half inches above the table from which the tin is fed when the foot is off the treadle?"

"A. Yes, sir."

"Q. When the person working the machine places his foot upon the treadle then what becomes of the die—what is the object of placing your foot on the treadle?"

"A. Placing your foot on the treadle presses the spring down and the die comes down and chops out the tin."

"Q. How long is it between the time the foot is placed upon the treadle and the coming down of the die?"

"A. Just as quick as you put your foot on the treadle she comes down. Down falls the die and no more than she clicks you take your foot off, and the die goes back in its place."

"Q. When you place your foot upon the treadle is there any noise made by the clutch falling out and catching into the wheel making the die move?"

"A. Yes, sir; it gives a signal, a click."

"Q. Is that plainly audible to the person in charge of the machine?"

"A. Yes, sir; it is plain enough to hear."

"Q. Then, as I understand, almost instantly as soon as you put your foot on the treadle you hear the click and the die drops?"

"A. Yes, sir; and your foot is off the treadle just as quick as it clicks."

"Q. Is this the size of the tin furnished you to feed to the die?"

"A. Yes, sir."

"Q. Is this continuously fed to the die until this sheet is chopped out and leaves a frame like this?"

"A. Yes, sir."

"Q. Was this machine in Stratton & Terstegge's factory when you first went there to work?"

"A. Yes, sir."

"Q. How long were you there before you were put to work on this machine?"

"A. About four months before I was put to work on this machine."

"Q. Do the persons who are employed to feed these machines have any selection of the machines upon which they desire to work or are they placed by the foreman and directed as to the machine they must operate?"

Question objected to.

Mr. Baird: "I want to show whether he was directed to run this machine or could run any other machine in the factory, whether he had any selection."

The court: "You may ask that."

"Q. Were you directed to work this particular machine by the foreman?"

"A. Yes, sir."

"Q. Do you know how long that machine has been in use or what its history is?"

"A. No, sir."

"Q. Do you know where Stratton & Terstegge got that machine, and whether they bought it new or second hand?"

"A. I heard—"

The court: "You need not state what you heard."

"Q. Did you hear that from Stratton & Terstegge or their foreman?"

"A. I heard it from their foreman."

Mr. Baird: "I think that is competent."

The court: "I hardly think it is. You may have an exception."

Mr. Baird: "I desire to prove and will prove, if this witness answers the question, and it is true, that the foreman who had control of these machines told this witness that

the machine had been purchased in Chicago, and was a second-hand machine."

"Q. Please state whether or not while you were working at Stratton & Terstegge's previously to the time you were injured, this machine had gotten out of repair and whether any persons were injured upon it?"

"A. Yes, sir."

The defendant objected to the question and answer.

The court: "I think it is competent to show that it was out of order, and I will allow you also to ask as to what the foreman said. I revise my ruling on that and save the point for the defendant."

"Q. State what the foreman said about that machine?"

"A. I was speaking to Mr. Snyder one day and I said, 'where did you get that machine with three clutches,' and he said that came from Chicago and was used there."

"Q. Is that the machine upon which you were hurt?"

"A. Yes, sir."

"Q. Please state whether or not that machine, previously to the time you were hurt, was out of repair at any time, and whether any person was injured on it?"

Question objected to by defendant. Objection overruled, to which defendant by counsel excepted.

"A. Yes, sir."

"Q. Do you know how many persons?"

"A. Only one; about four months before I was hurt. There was a young man by the name of Vetter running the machine, cutting out tin, and he was hurt by the machine by the clutch being out of order, causing the die to drop without his foot being on the treadle. It cut his finger.

This machine was taken and repaired and they put a square piece of steel in there, and it became battered up and they placed in two new clutches, and they were battered and I told them about it. That clutch was all battered up."

Q. By the court: "You say you told them about that?"

"A. Yes, sir."

"Q. State who you told and whose attention you called to the fact that the machine was in this condition?"

"A. I spoke to Mr. Snyder at least a dozen different times. After this machine was repaired there was a young man named Headly, and the machine dropped on him once, the clutch came out and thew the die down, and he' called Snyder and Snyder placed that back. I never noticed what Snyder did to the machine, and from the time it dropped then I saw it was battered up, and I did not want to run it, and I said to Mr. Snyder, 'that is all battered up and I do not like to run it; you don't know what minute your fingers are going to be cut off. You don't know what minute it will drop when a man is shoving tin in under the die.' "

"Q. Who is Mr. Snyder?"

"A. The foreman of the defendant's shop."

"Q. Is he in charge of all the machinery?"

"A. Yes, sir."

"Q. Is he the person who directs machinery to be repaired?"

"A. Yes, sir."

"Q. State what Mr. Snyder said to you when you made complaint, and what effect that had on you?"

"A. Whenever I made any remark or said anything about running the machinery Snyder would say 'that machinery

is all right.' I depended upon his word to know more about the machinery than I did. Snyder said the machine was all right and I took his word for it, and went to work on the machine."

"Q. How long before you were injured was it you made complaint to Mr. Snyder, the foreman, as you have just detailed?"

"A. I told Snyder twice the week before I was hurt, and the very day he sent me to work I said to Snyder, 'I don't like to work on that, I don't like that clutch being battered up.' He said, 'that is all right,' and I took his word and went to work."

"Q. When were you injured?"

"A. About half past 10 o'clock on the 10th of August."

"Q. How long had you been running on that machine that day?"

"A. From about 7 until about half past 10."

"Q. Explain to the jury how the machine acted at the time your fingers were cut off?"

"A. As I was cutting these, I cut out three of those pieces and just as I went to shove my last one under here this way the die jumped off and it chopped off a piece of the tin at the corner here and the tin pulled my finger right under it."

"Q. I show to you a piece of tin which was exhibited to the jury by defendant's counsel in his opening statement, and I ask you whether or not that is the piece of tin you were working on when you were injured?"

"A. No, sir. It was bent up and it pulled my fingers under and when the die came down it cut that tin off right this way. I let it down about that far, and just then the

die came down, because of the clutch being battered, and cut that off and that piece of tin pulled my finger right under."

"Q. I will ask you to use that board as a table on which to feed the tin to the die, and show how you were feeding it at the time the die was set in motion?"

"A. I was using the machine this way. When I place my fingers in there they never get any closer than this. I have got eight inches here to hold and then I shove it like this and I can hold it here until I get it down that far, and there is no danger of cutting my fingers as long as I have that much to hold, and when that die came down this tin doubled up and pulled my fingers in under there."

"Q. Is that the correct and proper way to feed the tin?"

"A. That is the way Snyder showed me to feed it. I think I could have more room by pulling it this way. Snyder told me to do it that way."

"Q. Were you operating it in the manner he showed you at the time you were injured?"

A. "Yes, sir."

"Q. Explain whether or not, as far as you know, the proper way to feed the tin is as was exhibited by defendant's counsel in the opening statement?"

"A. I think I should drop it here and catch it here, shoving it that way, but Snyder told me to do it the other way. I could have six inches this way, and the other way no more than the wink of your eye, and I took his word and run the machine just as he said. I thought if I didn't I would lose my employment."

"Q. When you started to push the tin in were you going to catch it here and shove?"

"A. Just as I went to drop that thing, I just had it dropped about that far, the die came down and chopped a piece off this corner and this tin bent under and pulled my fingers right under?"

Q. By the juror: "The die must have come down a second time?"

"A. Yes sir; it kept in motion until I called a man to stop the machine?"

"Q. State to the jury whether or not this die worked up and down after your fingers were cut?"

"A. This being battered up, it slipped out and the other two clutches passed and just as the third got to the catching point it grabbed its hold and put the machine in motion."

"Q. Did the die keep in motion?"

"A. Yes, sir; all the time.   There was no way of getting it out without loosening the wheel and catching it."

"Q. State whether or not that can be removed from the wheel and these clutches examined readily by the foreman or person in charge of the machine?"

"A. This wheel can be loosened and drawn out far enough without taking it all the way out and examined."

"Q. At the time you were injured did you know that the machine was dangerous to your fingers?"

"A. As I was telling you I warned Snyder about it.   I was kind of scared to run it."

"Q. Did you know that the machine was dangerous to your fingers?"

"A. I thought it was dangerous, but Snyder said no, and I took his word.'

"Q. Did his statement relieve you of your idea that it was dangerous?"

"A. Yes, sir."

"Q. Please show your injuries to the jury?"

"A. I lost this finger, two joints and some off this finger. This finger is nearly back where it was."

"Q. The finger which is cut off above the second joint is the index-finger of your right hand?"

"A. Yes, sir."

"Q. And the one which was cut, but no joints cut off, was the index-finger of your left hand?"

"A. Yes, sir."

"Q. Explain how long you suffered and how much?"

"A. I suffered with this about two months, pains in my right arm from my right hand. I was hurt on Thursday and the next Sunday I suffered so much pain in my right hand that I never slept a wink. I had to go to the doctor and get him to take out one of the stitches so that the corruption could come out and that relieved me some, but the pain was so much that I could not sleep."

"Q. Do you suffer any now?"

"A. Not much except in cold weather. That paralyzes my right arm, and the least little lick there goes all through me. I have to wear a stall on it all the time."

CROSS-EXAMINED BY MR. O' NEAL.

"Q. You will be twenty-one years old in June?"

"A. Yes, sir."

"Q. You had been working for this company about a year and a half when you were hurt?"

"A. Yes, sir; that is what Mr. Snyder said."

"Q. How long is your recollection independent of what Snyder said?"

"A. I didn't pay any attention to it. I know I worked there a long time."

"Q. You worked there about a year and four months and then went to work on this machine.

"A. Yes, sir."

"Q. And worked on that machine from that time on?"

"A. Off and on, not steady."

"Q. You were frequently on this machine?"

"A. Yes, sir."

"Q. You had been on it some months before you were hurt?"

"A. Different times."

"Q. When was it you noticed this machine was out of repairs, the first time?"

"A. The day Headly got hurt."

"Q. When was that."

"A. Right after this, as I was telling the jury—"

"Q. Just answer my question; when was that?"

"A. That was two months before I was hurt."

"Q. Where was it?"

"A. It was there where I was. The machine broke when this other young man was hurt and they put that piece of iron on it."

"Q. And you say that was battered up?"

"A. Yes, sir."

"Q. You knew it?"

"A. Yes, sir."

(44)

"Q. Did that make the machine dangerous?"

"A. I thought it did. I never liked to run it."

"Q. Two months before you were hurt you saw the danger in the machine?"

"A. Yes, sir."

"Q. When did you notice anything else the matter with the machine besides that battered piece you speak of?"

"A. When that die dropped on Headly that attracted my attention, and I looked at it."

"Q. I asked you when did you notice anything else was the matter?"

"A. I noticed it every time he would tell me to run it, and I would tell him I didn't like to run it."

"Q. Was that the only trouble you saw in the machine?"

"A. I noticed it was getting battered up."

"Q. Did you notice anything else besides that battered thing; any other trouble with the machine?"

"A. One of the clutches was worn off."

"Q. When did you notice that?"

"A. The day Snyder took the wheel out of place and put the two clutches in."

"Q. How can the jury know when that was?"

"A. It was two months before I was hurt."

"Q. Did that make the machine dangerous?"

"A. The battering up made the machine dangerous, I thought."

"Q. Would it drop without anybody putting a foot on the treadle?"

"A. Yes, sir."

"Q. You saw that?"

Lasch, by &c. v. Stratton, &c.

"A. Yes, sir."

"Q. You knew it to do that?"

"A. Yes, sir."

"Q. You knew that that machine would drop without anybody putting a foot on the treadle?"

"A. That is my idea."

"Q. Didn't you see it do it?

"A. Yes, sir; one time on Headly."

"Q. You are determined to get in Headly?"

"A. I saw the accident."

"Q. Is that the only time you saw it drop before you were hurt?"

"A. I saw it drop on Vetter."

"Q. Besides dropping that couple of times, what else did you see about the machine?"

"A. The battering."

"Q. Did it ever drop on anybody besides Headly and Vetter?"

"A. I heard the boys speaking of it hurting another one."

"Q. You knew two months before you were hurt that this machine was dangerous?"

"A. I thought it was dangerous and spoke to Snyder."

"Q. You believed it to be dangerous?"

"A. I took his word for it.  He said it was all right."

"Q. What was your opinion?"

"A. I thought it was dangerous."

"Q. And you continued to work on it, believing it was dangerous?"

"A. I took his word.  I thought it was dangerous all along."

"Q. Explain to the jury how long you saw the clutches coming out and the wheels revolving and that battered thing; all these things before you were hurt?"

"A. I seen those clutches fall out twice and throw the die down on Vetter, and once on Headly."

"Q. First you only saw it one time, and now you say you saw it both?"

"A. I saw it both."

"Q. When did you ever see that machine act badly or dangerous besides those two times?"

"A. I never saw it act any ways badly, but I did not like the idea of running the machine when they got hurt."

"Q. How long did that battered business stay there; clear up to the time you were hurt?"

"A. Yes, sir."

"Q. And these clutches would fall out; that has been going on two months?"

"A. Yes, sir."

"Q. You knew that?"

"A. Yes, sir."

"Q. You knew that made the machine dangerous?"

"A. Yes, sir."

Edward Milton, called for the plaintiff, being duly sworn and examined by Mr. Baird, testified as follows:

"Q. In August, 1893, at the time the plaintiff was injured at the defendant's factory, were you employed in the same factory?"

"A. Yes, sir."

"Q. What were you at work at at the time?"

"A. I was cutting out some four-part boxes on a pair of square shears."

"Q. How far from Fred Lasch?"

"A. About fifteen feet."

"Q. Did you see him at the time he was injured?"

"A. No, sir; not at that time."

"Q. How long was it after he was injured that you saw him?"

"A. It was when they were taking him down the steps."

"Q. Did you see the machine on which he was engaged after he was injured?"

"A. Yes, sir."

"Q. Tell the jury how the machine was doing?"

"A. It was at a standstill then; it was at a stop."

"Q. Please explain whether or not you saw anything done to the machine immediately after he was injured; if so, who it was and what was done?"

"A. After Lasch had been taken home by Snyder, Snyder returned to the shop and going up to the machine he drew the wheel out; after unloosening the machine he took something out of the wheel and took something up to the front part of the shop and worked on it fifteen minutes, and then returned and replaced it in the wheel."

"Q. After he took that thing out and took it up to the front part of the shop and worked on it and then came back and put it back again, did he operate the machine?"

"A. Yes, sir.   He put the belt on and ran the machine."

"Q. State whether you know where this machine came from?"

"A. It was brought from Chicago from what I understood."

"Q. Second-handed or new?"

"A. Second-handed."

"Q. Who did you hear that from?"

"A. From the foreman in the shop and from all of them around there."

"Q. Are you related to Fred Lasch?"

"A. I am his brother-in-law."

### CROSS-EXAMINED BY MR. O'NEAL.

"Q. What do you do now?"

"A. Working in the tin business."

"Q. Where?"

"A. On Eighth street."

"Q. Did Lasch marry your sister or you marry his sister?"

"A. I married his sister."

"Q. You were discharged by Stratton & Terstegge?"

"A. I was laid off on account of dull work."

"Q. Were you not discharged?"

"A. No, sir. I was laid off on account of dull work, and was to be taken back when business got better."

"Q. When was that?"

"A. Three weeks after he was hurt."

The plaintiff here rested.

It is earnestly contended by counsel for appellee that the evidence shows contributory negligence upon the part of appellant, or at least his knowledge of danger was such as to preclude his right to recover. Many authorities are cited to sustain the aforesaid contention, but we are unable to see that any of the authorities cited sustain the contention of

appellee.   It is well settled that if an employe is well aware
of the danger, and that the master does nothing to allay his
fears or to mislead him, that no recovery can be had for
injuries resulting from defects or dangers which were well
known to the servant, but this case does not come within
the rule aforesaid.   It will be seen from the evidence that
the appellant, a minor, had knowledge that some time before
his injury that other servants had been injured by the
machine, which he was operating, but it is also shown by
the testimony that appellant notified the foreman of appellee,
who had charge and management of the factory, that the
machine was dangerous, or at least expressed a fear of it,
but he was assured by the foreman that the machine was all
right and not dangerous, and it further appears that the
appellant relied upon the assurance of the foreman and
commenced operating the machine.   It does not appear that
appellant had theretofore for any considerable length of
time operated that machine, although he had been in the
employ of appellees for a year or more.   It is also worthy
of note that all appellant had to do was to operate the
machine, or at least the work assigned him was to place the
sheets of tin in proper position, and then place his foot upon
the treadle and the cutter should then come down, and
immediately rise again when the foot was taken off the
treadle.   The appellant had no other control or management
of the machinery.   It was manifestly the duty of appellee's
foreman to furnish reasonably safe machinery to be operated,
and they must be held responsible for injuries resulting
from a failure to do so unless the injured party was guilty
of contributory negligence, or was equally well aware of the

danger and as capable of judging thereof as the master.

In this case there is no evidence at all that appellant was guilty of any contributory negligence in handling or attempting to operate the machine, nor is there any evidence that he knew anything about the machinery or the danger thereof, except the fact that some others had been injured while operating it, and of the further fact that one of the clutches was somewhat battered, and his fears in regard to the foregoing were made known to the appellee's foreman, as before stated, and the foreman assured him that the machinery was all right. It would be unreasonable to require an employe, especially it would be unreasonable to require this appellant, to understand and know the perfections and imperfections of such machinery, as well as the appellee or his foreman would know. The master, or his authorized agent, must, of necessity, determine the kind of machinery to be used, and must judge and determine when it is out of repair; when it is safe or unsafe. It would be a harsh and unreasonable rule of law to require the servant to be as capable to judge of the sufficiency or safety of machinery as the master. Such a rule would greatly interfere with the proper and reasonable conduct of business. It seems to us that the servant in all cases has the right to rely on the assurance of the master as to the safety of machinery where the attention of the master has been called to it, and especially so when the master's duty and opportunity rendered him more capable of judging of the condition or suitableness of the machinery than is the servant. The principles announced in the following cases seem to sustain the foregoing views: L. & N. R. R. Co. v. Foley, 15 Ky. Law Rep., 17; L. & N. R. R.

Co. v. Shivell's Adm'x., 14 Ky. Law Rep., 903; Quaid v. Cornwall, 13 Bush, 601; Ashland Coal and Iron Ry. Co. v. Wallace, *ante* 626.

In the case of Flahiff v. L. & N. R. R. Co., decided by the Superior Court, it is said: "Where a servant, in obedience to an order of his superior and relying upon his superior knowledge and assurance of safety, places himself in a posi- tion of danger, the master is liable for any damage he may sustain, unless the danger was so obvious that no prudent man would enter into it, even when, like a servant, he was not entirely free to choose."

The case of Thorpe v. Missouri Pacific Ry Co., decided by the Supreme Court of Missouri, 2 S. W. Rep., 3, was a case involving the liability of defendant for injury to the plaintiff. The defendant relied upon contributory negligence, or, in other words, upon the fact that the plaintiff knew of the danger. In discussing the question the court said: "But again counsel for defendant urge a further question and objection to the recovery in this action, which is that the testimony of the plaintiff himself shows that whatever danger there was in working in the yard of defendant with three men was well known to him more than a week before his alleged injury, and that he continued in said work under such circumstances, and with such knowledge, until the happening of the accident; that he, therefore, voluntarily assumed the risk, waived the obligation of the defendant to furnish an additional workman as to himself, and, if he was injured by such delinquency on 'the part of the railway company, he is without remedy against the company for damages. This was, as already stated, set up in the answer

of defendant as a further defense to the action. A proper disposition of this question, which is, we think, the most important in the case, makes it desirable, if not necessary, to state the facts especially pertinent and relevant in this connection. The evidence advanced upon the trial shows that plaintiff had considerable experience in this branch of the railroad business; that some months previous to the accident he had worked for a while—perhaps for three or four weeks—for defendant in its said yards in Kansas City, where he was injured; that about ten days before the accident happened he had again resumed work for defendant in this capacity, at which time there were, including plaintiff, four men in the 'switch crew,' but that a few days thereafter one of the men quit work, leaving plaintiff and two others to do the work. Plaintiff had complained of the insufficiency in the number of hands to the yardmaster previous to the accident. He also says in his evidence that, while four men were necessary to do the required work, he remained when there were but three men because he thought, by being careful, they might go ahead.

, "The question then is whether the plaintiff, in remaining at work under these circumstances must be held to have waived the discharge of defendant's duty to him in this behalf, and to have assumed the risk incident to the performance, or attempted performance, of the work with three men instead of four; or, in other words, was his knowledge of the dangers and risks involved in his undertaking to carry on the work with the reduced force such as will necessarily charge him with negligence? In some of the cases of this sort, where a recovery has been denied, the

servant has been deprived of his right of action upon the ground of waiver and assumption of the risk, and in others upon the doctrine of contributory negligence. (Shear. & R. Neg., 126; Clark v. Holmes, 7 Hurl. & N., 937; Laning v. New York Central R. R., 49 N. Y., 521.)

"Again, it is said that mere continuance in the employment, with knowledge of defective or inadequate appliances causing the injury, is not necessarily fatal to the right of action (Wood, Ry. Law, 1460), and that such previous knowledge of danger is only a part of negligence, or that it is a strong circumstance tending to show negligence on the part of the servant, or at least one to be considered, but that it is not necessarily decisive or conclusive. (Snow v. Housatonic R. R., 8 Allen, 450; Wood, Mast. & Serv., 720; Clark v. Holmes, 7 Hurl. & N., 942.)

"The servant is not necessarily chargeable with negligence in remaining in the employment, although he may know that the appliances are defective and insufficient, if the danger or risk is not such that, as a prudent man, he was bound not to assume them, and to refuse to continue in the service. (Shear. & R. Neg., 3rd ed., 125; Wood Ry. Law., 1460; Wood Mast. & Serv., 761; Snow v. Housatonic R. R., supra; Patterson v. Pittsburg R. R., 76 Pa. St., 388; Filer v. Railroad Co., 49 N. Y., 50; Clark v. Holmes, 7 Hurl. & N., 942.)

"If the defects or insufficiency in the appliances, which term embraces the men employed to do the work as well as other instrumentalities employed, is so great that obviously, with the use of great caution, the danger was imminent, then, as a matter of law, the servant who incurs the risk is

guilty of contributory negligence, and can not recover; but if upon this question there is substantial doubt, the question is one of fact for the jury, and a nonsuit or demurrer to the evidence is not permissible. (Wood Ry. Law, 1460; Wood Mast. & Serv., 761.) Perhaps the leading case upon this subject is that of Snow v. Housatonic R. R., already cited. In that case the plaintiff had been aware of the defect that caused his injury for more than two months previous to the accident, and a suggestion was there urged, similar to the one now being considered, that plaintiff ought not to recover because he continued in the performance of his duties after he was aware of the defect; but the court refused to so hold as a matter of law upon the ground that his continuance in the employment did not necessarily and inevitably expose him to danger.'

"Speaking for this court, in the case of Conroy v. Vulcan Iron Works, 62 Mo., Wagener, J., uses this language: "Where the defect is so glaring that, with the utmost care and skill, the danger is still imminent, so that none but a reckless man would incur it, then, if the servant will engage in the hazardous undertaking, he must be considered as doing it at his peril. But if the defective machinery or appliances, although dangerous, are not of such a character that they may not be reasonably used by the exercise of skill and diligence, the servant does not assume the same risk. He is required to take, and will be held responsible for, the care incident to the situation in which he is placed, and whether he exercised that degree of caution is a fact for the determination of the jury.'

"But whether based on the one doctrine or the other is,

we think, immaterial. The facts which in the one set of cases are held to show the waiver, are such, in effect, as are held to constitute the concurring negligence in the other. Shearman & Redfield, who in their valuable work on Negli gence, hold that the doctrine is a branch of the law of waiver, say that 'a party to any other contract, having mutual obligations, is allowed to fully perform his part, notwithstanding the failure of the other party to fulfill a condition precedent, without necessarily waiving his right to insist upon performance of such condition at a later period. It is not fair to require from servants a more peremptory assertion of their rights against the master than would be required between parties standing upon a more equal footing. The dependent position of servants generally makes it reasonable to hold any notice on their part sufficient, however timid and hesitating, so long as it plainly conveys to the master the idea that a defect exists, and that they desire its removal; that the real question to be determined in each case is whether, under all the circumstances, the master had a right to believe, and did believe, that the servant intended to waive his objections to the unfitness of his fellow servant, or the defects in the materials provided for the work.' It is also held in a number of cases that the assumption of the risk only follows as a result from the servant's remaining after knowledge of the defect, where he continues without objection or protest or complaint on his part. (Thomp. on Neg., 1009, and a line of cases cited in the note to the text.)

"Under these authorities the question is, was the plaintiff reasonably justified in believing that three men, by being

careful, might go ahead with the work, though the same might be more dangerous than usual, or was the danger in so doing so obvious and imminent, and injury so probable, that, under the same circumstances, a prudent man would have regarded it as negligent to undertake to perform the particular duties which the work required? Perhaps reasonably prudent men, similarly situated, might have taken different views of this question of their duty in the premises, and, if so, the case is one for the jury. Indeed, the theory of the defense to this action is in part that three men could properly and safely do the required work. To this effect is the testimony of the witness, Sheriff, the general yardmaster of defendant. Plaintiff with the two remaining men, safely performed the work in which he was engaged when injured, for a number of days after the other man quit; and that, it is said, is a circumstance to be considered, and bearing upon the question of plaintiff's contributory negligence. (Wood Mast. & Serv., 760, par. 386; Patterson v. Pittsburgh, &c., R. R., 76 Pa. St., 389.)

"Whilst, as the event shows, the judgment of plaintiff in remaining was erroneous—the danger greater than it appeared to him—it tends to show that it was not so great or obviously imminent that injury therefrom could not reasonably be expected to be avoided, 'by being careful;' which, in this connection, we think, means by the use of additional or more than ordinary precaution, (Shear. & R. Neg., 125). The absence of the fourth man rendered the labor of coupling, uncoupling, switching and handling the cars more onerous generally, and more than ordinarily dangerous; but we think we ought not to say upon the evidence before us,

as a matter of law, that plaintiff waived the discharge of the defendants' duty to him to furnish sufficient help, and that he voluntarily assumed the particular risk or danger that caused his injury, or that the evidence is such as conclusively indicates a state of facts and circumstances that required him to peremptorily abandon and discontinue his said employment."

It seems clear to us that upon both reason and authority that in this case appellant had the right to rely upon the assurance of the agent of the master as to the safety of the machine, and that appellant was not in any sense guilty of contributory negligence.

It, therefore, follows that the court erred in giving the peremptory instruction, and the judgment appealed from is reversed and the cause remanded, with directions to set aside the judgment and verdict and award appellant a new trial and for proceedings consistent with this opinion.