## BARNEY DUMPING BOAT CO. v. CLARK.

(Circuit Court of Appeals, Second Circuit. December 6, 1901.)

MASTER AND SERVANT—UNSAFE PLACE TO WORK—ASSUMPTION OF RISK.

A servant has the right to remain in the employment for a reasonable length of time, although the place where he is required to work is obviously dangerous, without being held to have assumed the risk from such dangers, when he has been promised by the master that the place will be made safer, either by repairs or by structural changes which would lessen the danger; and, where the master is a corporation, he may be justified in relying on such a promise made by its superintendent in charge of the work, who assumes to have authority to make the changes promised, although he may not in fact have it.[1]

In Error to the Circuit Court of the United States for the Southern District of New York.

This cause comes here upon appeal from a judgment of the circuit court, Southern district of New York (109 Fed. 235), entered upon a verdict in favor of defendant in error, who was plaintiff below. The action was brought to recover damages for personal injuries. Plaintiff was employed to work on defendant's dumping boat No. 17 in September, 1894. It was an iron boat used for dumping garbage, and built in two longitudinal sections, so as to open in the middle. The accident happened on the deck covering the

---

[1] Assumption of risk incident to employment, see note to Railroad Co. v. Hennessy, 38 C. C. A. 314.

round stern of the boat, and which is a part of the rear bridge or platform, of which the boat has three, which remain stationary when the boat is opened to dump. Part of this deck is occupied by a deck house, inside of which is the wheel. Over the exposed portion of the deck swings the tiller, being operated through blocks, containing sheaves or pulleys on which the wheel rope runs, located one to starboard and one to port. Two bitts or posts 1 foot square and 3½ feet high project up from the deck. The distance between them is 9½ feet. Their use is to hold the hawser by which the boat, which has no motive power of her own, is towed. The blocks through which the tiller chain runs are located a little aft of the bitts, and somewhat further out. The top of each block is an iron plate 11 by 16½ inches. The height of the block is 12 inches. The distance between the outside of each bitt and the inside of each block is 1 foot. The distance between each bitt and the deck house is about 11 inches. Just aft of the deck house are two hatchways 6 inches high. The tiller swings over a part of these hatchways, but on the starboard side of the boat, where plaintiff was standing when the accident happened, the inner part, over which the tiller does not swing, is 13 inches long on its starboard side, and 11 inches long on its port side. On December 19, 1894, between 7 and 8 p. m., while the boat was being towed stern-first out of the slip, it became necessary to shift a hawser off the starboard bitt. Plaintiff and the mate lifted it off, and the mate had just started forward with it, when the rudder was struck by the tide rushing by the end of the pier, in consequence of which the tiller swept swiftly around from amidships to starboard, and struck the plaintiff, injuring him severely.

E. C. Perkins, for plaintiff in error.

Fredk. E. Perham, for defendant in error.

Before WALLACE and LACOMBE, Circuit Judges, and TOWNSEND, District Judge.

PER CURIAM. The first proposition advanced by the defendant is that there was no evidence in the case tending to show any negligence on the part of the defendant. It is, no doubt, true that the master is not bound to provide a safe place for his employés to work in, but only a reasonably safe place. It may often not be practicable to provide a safe place, the nature of the work precluding it. All that is required is that the master should act in that regard as a reasonably prudent man would do, and what is reasonable prudence depends always on the facts of each case. The jury in the case at bar, however, were fairly entitled to find that the stern deck was a place not even reasonably safe. That so much of that deck as was swept over by the tiller was a highly-dangerous place is manifest, and apparently not disputed. That it was so extremely difficult as to be well-nigh impossible for two men to work at the same time lifting a hawser off the starboard bitt, without one of them standing within range of the tiller, is plain from the model and the testimony. There was evidence in the case that the block might have been moved 11½ inches without making any appreciable difference in the steering capacity of the boat. This would reduce the area of danger. It does not appear that it was not entirely practicable to bridge over the area traversed by the tiller for a sufficient space near the bitt to give a safe platform to stand on, nor that it would not have been an easy matter to recess the side of the deck house near the hatchway for the few inches necessary to make that locality spacious enough to work in. It makes no difference, of course, that the place was not even reasonably safe,

if the danger was obvious, as it was here, unless in some way the plaintiff is relieved from the operation of the rule as to assumption of the risk; and the important question in the case is whether he is thus relieved, taking his testimony to be true, as we must on this appeal. Plaintiff testified that on the first pay day after he was employed he told West, the superintendent, that he "wanted the block taken away and the sheaves put on the bitt," and that West said he would attend to it in a few days, when the boat was hauled out, and that on two other occasions, the last of which was three or four days before the accident, he spoke to the superintendent (West) on the same subject, and it "was about the same way,—that he was going to have her fixed and hauled out, and everything would be satisfactory." This, with all the other evidence, was submitted to the jury under a full and careful charge, which is not here challenged; and their verdict found that plaintiff had received assurances which would induce a reasonably prudent man to keep along in the employment notwithstanding the obvious risk. It is pointed out in argument that to make the change suggested by plaintiff would so reduce the arc through which the tiller swung as to interfere with the steering capacity of the boat; also that the bitts are liable to pull out, and that to fasten the sheaves of the tiller chains on them would be most unworkmanlike construction. These considerations, however, go only to the credibility of plaintiff's testimony,—as to the probability or improbability of any such promise being made to him as he asserted that he relied on. It is manifest from an inspection of the model that such a change would materially increase the safe deck area available for a man working about the bitt. Therefore, if assurance was given that such change would be made, the jury might fairly find that he was not unreasonably imprudent in remaining in the employment.

It is the general rule that a servant, who has a right to abandon a service because it is dangerous, and who yet refrains from doing so in consequence of assurances that the danger shall be removed, will not be held to have assumed the risks of remaining for a reasonable length of time after such assurances. Defendant contends, however, that this applies only to cases of temporary defects,—to repairs as distinguished from new construction. It is difficult to understand any logical reason for such distinction. It may readily be conceived that an employer who would quickly respond to a request for repairs would treat as preposterous any suggestion that he should make structural changes in his machinery or buildings, and would probably tell his employé that, if he did not like to work at such a machine, he might go elsewhere and look for a better one. But if, on the contrary, the master chooses to make the promise, and does give assurance that he will make structural changes which will eliminate risk to life and limb, we cannot see why the employé may not rely on the one promise as much as on the other. We are referred to no authority which sustains this suggested distinction as a necessary antecedent to the conclusion arrived at. In Clarke v. Holmes, 7 Hurl. & N. 937, machinery became unfenced after the service was entered on. In Ladd v. Rail-

road Co., 119 Mass. 412, 20 Am. Rep. 331, there was no promise to supply "check chains," nor even any request to do so. In Sweeney v. Envelope Co., 101 N. Y. 520, 5 N. E. 358, 54 Am. Rep. 722, the court expressly holds that there was no promise to make the "change or improvement" suggested.

It is further contended that there was no authority on the part of West to make the changes promised. The court charged the jury that, "although he did not actually have the authority, if he assumed to have it, and the plaintiff reasonably reposed in the assumption, so that he could reasonably think that he had the authority," his promise, if made, would excuse the plaintiff for remaining a reasonable time in reliance upon it. We concur in the proposition thus charged, and his position as superintendent was sufficient to warrant the jury in deciding this branch of the case in favor of the plaintiff.

All question of contributory negligence was fairly for the jury. It was suggested that plaintiff might have put the wheel in a becket before he came out on the deck; but there was proof tending to show that the becket rope was not strong enough to hold it, and also that, if it were, becketing, under the circumstances, would have imperiled the rudder. So, too, it was perhaps possible for the plaintiff and the mate, by exercising great care, so to place themselves that they might have succeeded in both working at the hawser without standing in the dangerous area; but it was night, the call to shift the hawser was sudden, and the degree of care exercised under all the circumstances was a question for the jury.

The judgment of the circuit court is affirmed.