MOBILE & O. R. Co. *v.* CLAY.

(Division A. Jan. 27, 1930. Suggestion of Error Overruled Feb. 24, 1930.)

[125 So. 819. No. 28031.]

464

Baskin, Wilbourn & Miller, of Meridian, Rufus Creekmore, of Jackson, and Carl Fox, of St. Louis, Mo., for appellant.

**Reily & Parker**, of Meridian, for appellee.

Argued orally by **R. E. Wilbourn**, for appellant, and by **Marion W. Reily**, for appellee.

**McGowen, J.**, delivered the opinion of the court.

The appellee, Clay, filed his declaration in the circuit court against the appellant, the railroad company, for damages for a personal injury—the loss of his right eye. The original declaration was filed July 9, 1927; it was subsequently amended; and the railroad pleaded the general issue and assumption of risks. The cause was submitted to a jury, which returned a verdict for fifteen thousand dollars, the court entered judgment therefor, and the railroad prosecutes an appeal here.

The original declaration sought recovery, based on the negligence of the appellant railroad, for the loss of his eye while appellee was engaged in the service of the railroad as a fireman, firing the locomotive engine on his regular trip from Meridian to Okolona, in this state, at the time both parties being engaged in interstate commerce, as the Mobile & Ohio Railroad Company was, and is, a common carrier operating its railroad from St. Louis, in the state of Missouri, to Mobile, Alabama.

The negligence of the railroad company, as set forth in the original declaration, was based, first, on the large size of the lumps of coal furnished by the master on the tender of the engine, being so large as to be unsafe, as they had to be broken by the fireman while the engine was in motion; second, that the master furnished an unsafe place in which to work; and, third, that there were certain defects in the pick furnished by the master, with which to break up the coal—that the pick used on this occasion was a dangerous tool. In short, the original declaration alleges that, while he was breaking an excessively large lump of coal, he struck it with a pick, and small bits of coal flew therefrom, one of which struck him in the eye with force, from the effect of which he eventually lost his eye—the eyeball having been removed; that the injury to the right eye had greatly affected the vision of his left eye.

Subsequently Clay, the appellee, amended his declaration so as to charge the additional ground of negligence, in that the railroad company violated its duty to him by causing to be placed in the water contained in the tender attached to the boiler a boiler compound, which contained chemicals poisonous and injurious to the human eye; that this substance, so placed in the water, became a part of the liquid; that it was his duty to sprinkle the coal on the engine tender with water thus poisoned; and that the coal which, as fireman, he had to handle, had upon it this poisonous compound; and that this compound came in

contact with his eye through bits of coal and dust lodging therein, while he was in the customary discharge of his duties, thus being the proximate cause of permanent injury to his eye.

On the trial of the case, the court peremptorily instructed the jury that there was no liability on the railroad company because of the pick used in breaking the coal, and likewise so instructed the jury as to the condition of the cab in which Clay was at work. The court refused to instruct the jury, for the defendant, that there was no liability on account of the excessive size of the lumps of coal furnished by it.

The court refused, also, to instruct the jury that the railroad was not liable because of the boiler compound complained of, used in the water; and also refused the general peremptory instruction that no liability had been shown as against the railroad on the whole case. All the instructions requested by Clay, and granted by the court, were directed to the question of negligence vel non of the railroad company as to the boiler compound placed in the tender and therefrom sprinkled on the coal by the appellee, Clay.

The material facts are as follows: Clay was about thirty-five years of age at the time of his injury, and was engaged in the performance of his duties as a fireman for the Mobile & Ohio Railroad Company, on its locomotive engine, carrying freight in interstate commerce from Meridian, Mississippi, to Okolona, Mississippi. The engine was pulling a freight train; and he had a regular run as a fireman, and had been so engaged for about eight years. On June 12th, in response to a call for service, about six o'clock in the evening he assumed his duties on the engine. The hostler thereof loaded the tender with coal, the tender being connected with the floor of the cab by an apron of metal, and having gates so arranged that the fireman, standing in the cab, could handle the coal, using a shovel to pass it to the fire in the engine

box. While the engine and train were proceeding toward Okolona, a large lump weighing one hundred pounds, blocked the doorway, and he heaved this lump from the tender to the floor, and struck it a hard blow with a pick. Pieces of coal flew therefrom, some of which struck him in the eye and about the tip of his eyebrow next to the nose. He had made more than one complaint of the size of the coal to his superintendent, but had received no promise that this would be corrected; and he had continued to work, using coal of unusual size. He said that the railroad company was under contract with firemen employees, through their union, to furnish coal of a size which would pass through a five-inch ring. He stated that the lump of coal which struck him in the eye knocked him to his knees; but he continued on his trip. Next morning a physician examined his eye, took something therefrom, and treated it. He did not make the return trip on his engine, but went to his home in Meridian on the passenger train.

He saw the helper, or negro hostler, whose name he does not know, put four or five pieces or sticks of this compound in the water tank on the tender, just as they were preparing to leave on the trip. He testified to having sprinkled the coal several times on the trip before the injury was received, and the last time, a few moments before the injury, while the train was waiting at Scooba; this sprinkling being done frequently to prevent dust from flying into the cab of the engine.

Appellee's eye was examined, after he returned to Meridian, by several specialists; and about a month after the injury he applied to Dr. Bounds for treatment, who treated him until he removed his eye some time in August, 1927. He said he received no additional injury to his eye, and that his vision was good prior to this specific injury.; that, after his eye was injured, he rubbed it with his fingers, after having handled the coal.

A few days subsequent to his injury he procured from the roundhouse at Meridian several bars of boiler compound of the same general character as that he saw put into the water tank; and just before the trial of this cause in October, 1928, he delivered a piece of this compound procured to Dr. Katz for analysis.

Katz analyzed the boiler compound delivered to him by Clay, and found the following constituents:

| | | |
|---|---|---|
| Sodium carbonate (soda ash) | per cent. | 65.00 |
| Sodium hydroxide (caustic soda) | per cent. | 1.00 |
| Sodium phosphate, | per cent. | 5.00 |
| Mercuric Sulphide (vermillion) | per cent. | 2.50 |
| Sodium silicate (water glass) | per cent. | 15.00 |
| Water | per cent. | 7.00 |

This witness said that "soda ash" is a strong caustic, and, when it is brought into contact with the mucous surface, acts as a caustic, and develops a great amount of heat.

Dr. Bounds, the specialist in ear, eye, nose, and throat diseases for nine years, testified that he treated Clay, the appellee, from about a month after the injury was sustained until the date of the trial; that his eye grew steadily worse, and, in his own language, the condition of the eye, as he found it, was as follows:

"The pupil was widely dilated. The mucous membrane and the eyelids—there was a discharge all the time and the eyelids were as though they were of a burned character, and he suffered a good bit of pain with it all the time, and he had to use opiates in it until pratically—until I removed the eye, and had to use ice caps on it all the time trying to keep the pain down. . . .

"Q. Do you know whether or not he lost his vision through the injury to the nerves in his eye? A. It was partially due to the injury in his eye. My diagnosis is that it was due to a blow he received on the orbit of the bone above the eye and probably some foreign material." (Objection by counsel.)

The effect of this testimony as to the blow on the orbit of the bone above the eye was that this caused the bone to press unduly upon the optic nerve, which, as a result, atrophied—ceased to function, and died.

On cross-examination the doctor testified that, in another suit by Clay to recover insurance for the loss of this eye, he had testified that in his opinion the cause of the loss of the eye was the fracture of the orbital bone, at which time he had not been informed, and knew absolutely nothing of this boiler compound. When he examined the eye, he saw no abrasion therein. Relative to the analysis of the compound, he said that hydroxide and mercuric sulphide and soda ash were injurious to the eye, and gave it as his opinion that if such substances came in contact with the eye, it was a contributory cause to Clay's injury. He did not make an X-ray of the orbital bone, but gave it as his opinion that a fracture of that bone had been produced by a blow at that point.

Dr. Robinson also testified that sodium carbonate would be most detrimental to the tissues of the eye, and also sodium hydroxide.

In answer to a hypothetical question, he gave it as his opinion that the compound analysed by Katz, coming in contact with the membrane of the eyeball, would be a contributing cause of the loss of the eye.

It is not in dispute in this case that, when the boiler compound complained of was placed in the water tank, the water tank contained in excess of ten thousand gallons of water. Neither Dr. Bounds not Dr. Robinson was asked, in the hypothetical question submitted to them, what the effect of this compound would be when dissolved in ten thousand gallons of water.

Stuckey, a witness for the appellee, testified that he imagined the compound in use by the Mobile & Ohio Railroad Company at Meridian would weigh four or five pounds per stick or bar.

On behalf of appellant railroad company, Beach, the engineer, and Hambrick, a flagman, in the service of the Mobile & Ohio Railroad Company, testified that after the injury they looked at Clay's eye, and could see no foreign substance therein.

Lambert, the superintendent of motive power of said railroad company, testified that the boiler compound was necessary and desirable to be used in the water which passed from the tender to the engine; that it was used by railroad companies generally to soften the water, and prevent foam from being carried over with the steam, up through the throttle, and down through the steam chest and cylinders. This compound prevents the formation of rust, and adds to the safety and life of the boiler; the compound in use at the time of appellee's injury, and for a number of years prior thereto, had been bought from, and furnished by, the Bird-Archer Company, whose business it was to manufacture compounds adapted to use in the water in boilers of locomotive engines; that up to the time of Clay's injury he had never heard of any ill effects resulting from, or attributed to, the use of this compound.

Foster, a chemical engineer for the Bird-Archer Company, testified that they furnished their compound to substantially all the railroads in Canada, and to great numbers of railroad systems in the United States, South America, and Australia, approximating ninety railroads in all; that the United States Navy is one of its largest consumers; that they produced annually not less than fifteen million pounds of the compound; that they had been in the business thirty-nine years; that they kept men constantly engaged in going over the lines of railroad, instructing as to the proper use of the compound—the proportion being one pound to every two thousand gallons of water in the tank. The Bird-Archer Company makes three compounds, none of which contained, according to the testimony of this witness, the

same proportion of chemicals disclosed by the analysis of Katz, his compounds containing about thirty per cent of soda ash. Mr. Foster had no information of any injury caused by these compounds; he had furnished the Mobile & Ohio Railroad Company with its compound, under contract, for eight years prior to this accident, and for some time subsequent thereto; and his compounds, and others of similar character, were in universal use by railroad companies, and others engaged in the operation of steam-propelled engines. He also said that the employees of the Bird-Archer Company—a great number of them—were engaged in making the various chemicals used in the manufacture of the compound in the factory, and were constantly getting these chemicals on their hands, or other parts of their persons, in spite of which fact he had never heard any complaint of injury. A gallon of this solution contains approximately seventy thousand drops of water, with about one-ten thousandths of a grain of the compound to the drop—there are no scales delicate enough to weigh that amount; so the soda ash was only about one-fifteen thousandths of a grain to a drop of water.

Another witness testified as to the value of this compound in rendering the engine and boiler more effective for their intended use.

Dr. Donaldson, the physician who examined appellee on the morning of his injury, testified that he found a small cinder or bit of coal in his eye, which object he removed and treated the eye; that there was a slight abrasion of the eyeball, and his eyelids were red—but about like those of a man who had been up all night.

Two days after his injury Clay saw Dr. Moseby, an eye specialist, who treated him for about ten days, at the end of which period he could see no sign of any injury to appellee's eye; but, on the latter's complaining that he could not see, he was sent to Dr. Inge, chief surgeon of the railroad company, in the office at Mobile.

There, according to Dr. Wright's testimony—he having been a specialist in that line for thirty years—a thorough examination was made of the retina and inner parts of the eye with an opthalmoscope; and in his opinion the eye was in a normal condition, with the exception of a slight dilation. He said that by a certain test, although Clay claimed that he could not see, it was proven that he was malingering. Dr. Arnold also testified to the same effect.

Dr. Harrison, who examined him at the instance of the Brotherhood of Locomotive Firemen and Enginemen, also testified that he could discover no injury to the eye, after expert examination with improved instruments; this examination, however, was some months after the injury.

Dr. Constantine also testified that he examined appellee on the same date, making an independent examination. He also applied the malinger test, and said that Clay could see.

Dr. Hand, the state chemist, and professor of chemistry at Mississippi A. & M. College, testified that a solution of any and all of the compounds manufactured by the Bird-Archer Company, in a proportion of five per cent to ten thousand gallons of water, was harmless. He also said that the chemicals analyzed by Dr. Katz would be harmless if so diluted.

Some of the witnesses said that soda ash was used in soap throughout the country; that, while soda ash would produce a stinging sensation, it would not produce permanent injury.

Clay, in rebuttal, said that some of these oculists had examined him, and some had not, but that their examinations were superficial, and that they did not use the instruments and apply the tests to his eye in the examinations made—denying that he was examined at all by some of the specialists who claimed to have done so.

In the assignment of error, the appellant strongly urges objections to certain testimony and to the hypothetical questions, which are of serious import; but it is unnecessary for us to notice these objections, for the reason that we have reached the conclusion that the peremptory instruction requested by the appellant, and refused by the court, should have been granted.

As it is conceded that the Federal Employers' Liability Act (45 U. S. C. A., sections 51-59) controls the decision of this case, the parties to the suit being engaged in interstate commerce at the time of the alleged injury, it will only be necessary to apply the established rule laid down by the supreme court of the United States in order to determine whether or not there was liability in this case, since by the terms of that act Congress took possession of the entire field of employers' liability to employees where they are engaged in interstate transportation by rail, and all state laws on that subject are superseded. See Employers' Liability Cases, 223 U. S. 1, 15, 32 S. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44. The master or employer is liable for injuries or death resulting in whole or in part from negligence therein specified, and the negligence must be proved in order to entitle the injured party to a recovery. The character and quantity of the evidence necessary to establish negligence is not controlled by the several states; and, if it is determined, as a matter of law, that the evidence is not sufficient to sustain a finding that the negligence of the railroad was the cause of the injury, the common carrier is entitled to a peremptory instruction. See N. O. & N. E. R. Co. v. Scarlet, 249 U. S. 528, 39 S. Ct. 369, 63 L. Ed. 752.

In order to determine this fact, we must assume the appellee's evidence to be true, along with the other undisputed facts in the record. And appellee's whole case is grounded upon his evidence that bits of coal flew into his eye, that the dust from the coal flew into his eye,

and that he had sprinkled the coal with water from the tender of the engine—all of which occurred while he was discharging his duties—that his eye was injured at the time, and that he continued to suffer from them until the trial of the case.

It is undisputed in this case that the unfortunate appellee lost his eye; but the alleged negligence is based entirely upon the testimony of the expert witnesses, and is deduced by them from circumstantial evidence. Whenever circumstantial evidence is relied on to prove a fact, the circumstances must be proved, and not themselves presumed. See Manning v. Insurance Co., 100 U. S. 693, 25 L. Ed. 761.

No liability can be predicated upon the evidence that the lumps of coal were so large as to increase the danger or hazard to the employee in having to break them with a pick; because the evidence delivered by Clay demonstrates that, under the well-established rule, he could not recover in this behalf, conceding, for the sake of the argument, that it might be said that the breaking of large lumps of coal by a fireman engaged in his usual occupation of firing an engine increased the hazard or risk, which he did not assume; in the instant case such defect as existed was known to Clay, he had complained of it, and had received no assurance from his superintendent, but had been referred to his own labor organization. The superintendent made no promise to repair the alleged defect, and the appellee continued, after making at least two complaints at different times, to perform the duties of his employment, including breaking up the lumps of coal; and on this particular occasion was present, and saw the hostler load the coal from the hoist to the tender; and this large lump was so loaded then and there, presumably; and, although he knew the defects had not been remedied, and had no assurance that it would be, he continued on the employment, performing his usual duties. He assumed the risk.

In the case of Seaboard Air Line Ry. v. Horton, 233 U. S. 492, 34 S. Ct. 635, 640, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475, the court announced the law of the assumption of risks, to the effect that the employee assumes the risk of such dangers as are normally and necessarily incident to the occupation, and made this pertinent statement, which controls the case:

"When the employee does know of the defect, and appreciates the risk that is attributable to it, then if he continues in the employment without objection or without obtaining from the employer or his representative an assurance that the defect will be remedied, the employee assumes the risk, even though it arises out of the master's breach of duty. If, however, there be a promise of reparation, then during such time as may be reasonably required for its performance, or until the particular time specified for its performance, the employee, relying upon the promise, does not assume the risk unless at least the danger be so imminent that no ordinarily prudent man under the circumstances would rely upon such promise. Hough v. Texas & P. R. Co., 100 U. S. 213, 224, 25 L. Ed. 612, 617; Southwestern Brewery & Ice Co. v. Schmidt, 226 U. S. 162, 168, 33 S. Ct. 68, 57 L. Ed. 170, 173. This branch of the law of master and servant seems to be traceable to Holmes v. Clarke, 6 Hurlst. & N. 349, . . . ; Clark v. Holmes, 7 Hurlst. & N. 937."

It is the duty of the trial judge to direct a verdict for one of the parties when the testimony and all the inferences which may reasonably be drawn therefrom by the jury would be insufficient to support a different finding. Baltimore & Ohio R. Co. v. Groeger, 266 U. S. 521, 45 S. Ct. 169, 69 L. Ed. 419; Chicago, Milwaukee & St. Paul R. R. Co. v. Coogan, Adm'r, 271 U. S. 472, 46 S. Ct. 564, 70 L. Ed. 1041,

Applying these principles to this case, it appears to us manifest that the verdict herein cannot be permitted to stand:

First, because there is no testimony to show that the soda ash came in contact with the eye in any quantity sufficient to cause its loss. On the other hand, Dr. Bounds' testimony is clear and positive that the blow on the orbital bone is the only reasonable explanation of the loss of the eye; that was his diagnosis, and was his admittedly sworn testimony in another trial, in reply to the material question as to the cause of this injury; and, if his diagnosis, and deductions thereform, be correct, the compound could not have been a contributing cause in this case, for the reason that neither of Clay's expert witnesses was asked to pass upon the proposition of the solution of the compound in ten thousand gallons of water, as it relates to contact with his eye; and this, too, takes into consideration the imagination of the witness Stuckey that those pieces of the compound measured one and one-fourth by eighteen inches in length, and that such a bar or stick would weigh four or five pounds. An obvious guess.

The evidence of the experts offered on behalf of Clay that the undiluted soda ash, coming in contact with the abrasion on the eye, would probably cause injurious results, we assume, for the purposes of this decision, to be true, though it is strongly contradicted by the evidence tending to show its general use and the method of handling in the factory where this compound was manufactured. But in this case we have a small particle of coal, so small as to remain lodged in the eye and cause a slight abrasion of the eyeball. Although the lump of coal might be completely covered with the diluted solution, of necessity this particle of coal would contain only an infinitesimal amount of soda ash; and, so far as the other ingredients are concerned, there could scarcely be a trace of them in a solution of ten thousand gallons of

water. Therefore, according to the evidence in this case, the amount of soda ash coming in contact with appellee's eye was necessarily negligible.

We have referred to the bit of coal that caused the abrasion. It certainly did not remain there. And when we say this we leave out of consideration the fact that Clay did not suggest to Dr. Bounds the probability or possibility of the boiler compound having anything to de with the injury to his eye. He secured his sample four or five days after his injury, and allowed the doctor to testify in another case in which this same injury was in-volved without having an analysis made of the compound in his possession. But we are leaving this out of consideration, in reaching the conclusion that it is not shown that the solution-sprinkled bits of coal, coming in contact with the eye, under the circumstances detailed, was the proximate cause of the injury.

The hypothetical questions propounded to both experts did not embrace the diluted boiler compound; and so the evidence upon which the verdict rests is purely fanciful and speculative, and cannot be said to rest upon any substantial basis; nor can it be reasonably said, from the testimony in this case, that the small quantity of compound coming in contact with appellee's eye—if it did so—proximately caused this injury.

Second, it is shown in this case that the use of the boiler compound manufactured by this particular firm, a reputable concern, dealing with the common carriers of this and other countries, and with the United States Navy, could not be considered negligence on the part of the appellant, it being an article in general use by those engaged in the same line of business. Appellant had a right to rely upon the compound not being harmful, unless some notice of injurious results from its use came to its attention; and the record in this case discloses that no claim of injury had followed the use of this boiler compound up to the time of Clay's injury; and this

is true of the manufacturer as well. The Bird-Archer Company was selling millions of pounds of this compound, in which the major component part was soda ash, to the various railroads; and, though their own employees were handling soda ash, and the other chemicals composing the compound, in their raw state, their faces and hands being exposed to contact with these chemicals, there was no complaint of injury. If the appellant had been making a test, and had seen fit to investigate, Dr, Hland, the state chemist, would have told it there was no reason to fear any danger from the use of soda ash in this compound; and the average prudent business man of this state would consider such authority sufficient to rely upon.

From these observations it follows that we are of opinion that negligence on the part of appellant is not shown in this case; nor is it shown that appellant knew the compound to be dangerous, or had any reason to so believe; nor was it engaged in testing a new and untried article.

Of course, it was the duty of the railroad in this case, in the exercise of reasonable care, as required under the law, to provide a reasonably safe place for Clay to work, and to furnish him with reasonably safe instrumentalities. But it has never been the law that the master shall insure the safety of the servant; and he does not have to see that it is absolutely safe. Ordinarily reasonable care and diligence is all that is required.

It appears to us that in this case the master is not shown to have been negligent in using this boiler compound without warning Clay. In its use appellant appears to have conformed to the procedure of other railroads, and had purchased from a reliable manufacturer a compound which was in general use by those engaged in similar business; and there was nothing to warn the appellant of any hidden or latent danger from the use thereof,

In the light of the undisputed testimony of the chemist for the manufacturing concern, appellant had a right to rely upon the manufacturer, and to assume that his product could be safely used. The theory of appellee that the use of this compound was a new and untried experiment must fall, because not applicable to the facts of this case. See Richmond & Danville R. R. Co. v. Elliott, 149 U. S. 266, 13 S. Ct. 837, 37 L. Ed. 728; also Kent v. R. R. Co., 77 Miss. 494, 27 So. 620, 78 Am. St. Rep. 534; Miss. Cent. R. R. Co. v. Bennett, 111 Miss. 163, 71 So. 310; Lampton v. Atkins, 129 Miss 660, 92 So. 638.

We are led inevitably to the conclusion that the lower court should have granted the peremptory instruction for the appellant in this case.

Reversed, and judgment here for the appellant.