NEW ORLEANS GREAT NORTHERN R. CO. *v.* BRANTON.

(Division A.   March 20, 1933.)

|146 So. 870.   No. 30484.|

Flowers, Brown & Hester, of Jackson, and Henry Mounger, of Columbia, for appellant.

**T. B. Davis** and **Hall & Hall,** all of Columbia, for appellee.

**McGowen, J.**, delivered the opinion of the court.

On December 24, 1931, appellee's intestate, M. M. Branton, was struck by a north-bound train of appellant railroad company and injured, and, from the injuries received, he died a few hours afterwards. The deceased was employed by the appellant railroad company as a

trackwalker, and it was his duty to inspect and repair, where he was able, the track of the railroad company daily. He lived at White Bluff. It was his custom each morning to ride the train north to Tilton, a distance of about five miles, and return south, walking, inspecting the track, to White Bluff, where he would stop for his noonday meal, and from thence proceed south on the train to Morgantown, get off there, and walk back to White Bluff, examining the track, reaching the latter place about four o'clock in the afternoon; and this duty he would perform every day except Saturday.

Just prior to the accident, he was seen by a number of witnesses about one thousand feet north of the place of the accident. He told these witnesses that he was sick, that he had a chill, and then proceeded south. Shortly afterwards he was observed by these witnesses sitting on the edge of the cross-ties, within the sweep of a train, with his chin resting in his hands and his elbows on his knees, facing outward from the track with his back to it. For about one thousand feet north and one-half mile south of where he was thus seated, the track was comparatively level and straight. Branton had been engaged in the same duties for two years, and was furnished a schedule of the trains operating over the line, and he knew that an electric passenger train, proceeding north, was due at this point about eleven forty-five A. M. He was an active, alert man, with full possession of his faculties, so far as the record disclosed, and was about forty-one years of age. He left home on the morning of the accident apparently in good health, and appeared to be normal as he proceeded north on the train that morning. The track upon which he walked was an approximate distance of ten miles. At the time and place he was killed, he was about one mile north of his home. The same schedule of trains going over this line had been maintained for many years. The train which struck and

killed him was known as a gas-electric train, consisting of a power unit and one coach. The whole train weighed about one hundred eighty-five thousand pounds. There was no fireman on this train, only an engineer who occupied the engineer's compartment. These facts are undisputed.

Several witnesses, north of and close to the track, who saw and spoke to Branton a few minutes before he was killed, saw him afterwards seated, as detailed, about ten minutes before the arrival of the train. They heard the train, saw it, and heard the signals given, and, when it was about one thousand feet from Branton, heard the signals of the engineer, which continued at intervals, but they said the engineer did not apply his brakes or slacken the speed of the train until the train was "right on" Branton, estimated to be some twenty-five to forty feet from him. The train was traveling forty-five miles an hour. A number of witnesses testified that immediately after the injury they examined the track, saw where the rails commenced to be "blistered," and continued to where the train stopped, after it had struck Branton, the distance of "blistered" rails being approximately three hundred ninety-five feet from the beginning point on the south to where the engine, or front unit, stopped north of the accident.

Some experts testified that, although they had never operated a gasoline-electric engine, they had operated steam engines, and that the principles applicable to air brakes were practically the same. To this statement the engineer assented. They estimated that the train could have been stopped, running at forty-five or fifty miles an hour, by the application of emergency air brakes in good order, from two to three times the length of the train, which was one hundred forty feet. Many witnesses testified that the engineer gave the alarm signal when he was within one thousand feet of Branton. The

witnesses north of the scene of the accident, testified that Branton made no movement or showed no evidence of response to the signals of the engineer. They claimed to have heard the noise and to have seen when the brakes were applied.

The evidence of the engineer and the railroad witnesses tended to establish that the engineer observed something on the cross-ties when within nine hundred to one thousand feet of it, and that it appeared to be a dingy, yellow object; that it had rained that morning, but was not raining at the time of the accident; that Branton, the deceased, was sitting about eight feet south of the southeast bulkhead of a trestle which blurred the engineer's vision; that he thought it was a small animal, but continued to sound his whistle; that when at a point about nine hundred feet from the object, upon discovering it was a human being, he immediately applied his emergency brakes, pressed his alarm signal or whistle to the limit, but said it was impossible to stop the train at the rate of speed he was making under nine hundred feet. The train passed the point of contact with the deceased about three hundred thirty feet.

Looking south from where Branton was seated, there was nothing to obstruct either his or the engineer's vision for about a half mile. The engineer said that Branton never responded to his signals; that he did all he could to prevent injuring or killing Branton, who was his friend. He also said that the application of the brakes in an emergency would not cause "blisters" on the rails, for, if that occurred, it would so flatten the wheels of the cars as to make it dangerous to move the train, and that he proceeded with the train. He further stated that the track was wet, and sand was applied to it at the same time he applied the emergency brake. There are other facts unnecessary to detail.

1. It is contended by the appellant railroad company

that the parties hereto were engaged in interstate commerce, and therefore the Federal Employers' Liability Act (45 U. S. C. A., sections 51-59) applies; and this is conceded. Appellant contends also that there is no conflict in the evidence as to how this accident happened. It was conceded that the air brakes and all appurtenances and appliances of the train were in perfect order, and that they were not defective.

It is the position of the railroad company that no negligence has been proved as applied to this character of cases, and that the facts are not in conflict. In cases arising under the Federal Employers' Liability Act, there can no longer be any dispute over the proposition that the burden of proof is upon the plaintiff to show negligence, and that the injuries complained of are the result of such negligence. See Yazoo & M. V. R. Co. v. McCaskell, 118 Miss. 629, 79 So. 817; Gulf & S. I. R. Co. v. Hales, 140 Miss. 829, 105 So. 458; Mobile & Ohio Railroad Co. v. Clay, 156 Miss. 463, 125 So. 819; Employers' Liability Cases, 223 U. S. 1, 32 S. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44.

The engineer was under no duty to stop the train in the country every time he saw a person on the track where nothing unusual occurred; and he had a right to assume that a person walking or sitting upon the track is in possession of his normal faculties and that such person will note the alarm given and take due precaution for his own safety. Where that person is an adult normal person, it is not even the duty of the engineer to slacken his speed until circumstances arise which appear to his mind, or should bring to his mind, the reflection that the person is not normal or has not heard the alarm and will probably not seek his safety in due time. Yazoo & M. V. R. Co. v. Lee, 148 Miss. 809, 114 So. 866.

The plaintiff's theory was that this train, by the "blistered" places on the rail, was stopped by the engineer

after he applied his emergency brakes at a distance of three hundred ninety-five feet. This was competent testimony. The fact of the rails being "blistered" was perhaps in dispute; the fact of the point at which the emergency brake was applied by the engineer was in dispute; and also the fact of the distance intervening between the running train, when the brakes were applied, and the deceased. By jthe engineer's own admission, he applied his brakes when six hundred feet from the deceased. He states that he could not stop the train within less than nine hundred feet. If, as the engineer says, he applied his brakes within six hundred feet, according to the plaintiff's testimony that train should have been stopped or the jury might have found that the train could have been stopped anywhere from one hundred fifty feet to two hundred feet before the engine unit struck Branton. If this be true, the engineer, after discovering the peril of the deceased, was guilty of negligence, which would be imputed to his company.

2. It is next insisted by the railroad company that Branton, the deceased, assumed the risk incident to his employment by sitting upon the cross-ties in the manner detailed, close upon the time scheduled for the approach of a train of which he knew, and that it was a risk incident to his employment. And there was no dispute of these facts. The inference to be drawn from this testimony is that the deceased was negligent in thus sitting upon the rails. But we see no room for the application of the doctrine of assumption of risk in this case. It was not a question of risk; it was a question of the deceased's own negligence. However, that question was submitted to the jury at the instance of the railroad company.

In cases arising under Federal Employers' Liability Act, the doctrine of assumption of risk is applied as at common law; but negligence is one thing, and assump-

tion of risk is another. Of course, Branton, the deceased, knew when he walked on the track that a train would run thereon; and the risk incident to the running of a train thereon while walking on it he assumed. But sitting down upon the end of the cross-ties was negligence on his part, and the jury in this case were instructed that they might diminish the verdict, if they found the railroad company's servant negligent, by an amount in proportion to the negligence of the deceased. The distinction between negligence and assumption of risk is clearly drawn in the case of Seaboard Air Line Ry. Co. v. Horton, 233 U. S. 492, 34 S. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475. At best, his remaining seated in the face, and in the path, of an on-coming, rapidly moving train, conscious of his act, was a question for the jury as instructed by the court. See above case and also McGovern v. P. & Ry. Co., 235 U. S. 389, 35 S. Ct. 127, 59 L. Ed. 283, and Chesapeake & O. Ry. Co. v. De Atley, 241 U. S. 310, 36 S. Ct. 564, 60 L. Ed. 1016. Branton was either unconscious at the time the train struck him or a suicide, and the jury evidently found the former to be the fact.

There are other errors assigned and argued, but they are without merit.

The case has been fairly tried, and we find no reversible error therein.

Affirmed.