484 P.2d 359

John A. WILLIAMSON, Plaintiff-Appellant, and
Royal Globe Insurance Group, Plaintiff-in-Intervention,

v.

E. J. SMITH, d/b/a E. J. Smith Plumbing & Heating, and J. R. Trenching and Excavating Company, Inc., Defendants-Appellees.

No. 539.

Court of Appeals of New Mexico.

March 26, 1971.

Certiorari Granted April 21, 1971.

Irwin S. Moise, Sutin, Thayer & Browne, Albuquerque, for plaintiff-appellant.

J. J. Monroe, Joe Diaz, Iden & Johnson, Albuquerque, for appellee E. J. Smith.

C. LeRoy Hansen, Civerolo, Hansen & Wolf, Albuquerque, for appellee J. R. Trenching and Excavating Co.

## OPINION

SPIESS, Chief Judge.

The plaintiff, Williamson, a journeyman plumber, was employed in laying a sewer line along the bottom of a trench which had been cut to and partially through a street in the City of Albuquerque. The particular work was being performed in connection with a construction project of Warren Properties. It appears that defendant, E. J. Smith, a master plumber, was employed by Warren Properties to assume charge of the plumbing work. Smith had secured the services of Williamson through a local union by means of an employment contract between Smith and the local union. The trench had been cut by J. R. Trenching and Excavating Company, Inc., (J.R.) through the use of a trenching machine.

As Williamson was performing his work in the bottom of the trench a cave-in occurred and as a result he was injured.

The soil in the area of the trench and at the point of the cave-in was composed of a loose sand overlaid by approximately four feet in thickness of hard, packed dirt. At the point of the cave-in the trench was about 10 feet 11 inches in depth.

The cause of the cave-in was attributed to the "sloughing off" into the trench of the sand which supported the hard, packed dirt. This "sloughing off" of the sand was due, at least in part, to vibrations caused by vehicular traffic upon the street.

Williamson, by his complaint, sought damages against Smith and J. R. on account of injuries which he had sustained upon the ground that both Smith and J. R. had a duty to shore and crib the trench and both failed so to do; that the cave-in odcurred and he was injured as a direct and proximate result of the failure of both Smith and J. R. to shore and crib the trench.

In answer to the complaint Smith and J. R., among other defenses, pled assumption of risk on the part of Williamson. Depositions of Williamson, Smith and the president of J. R. were taken. Thereafter Smith and J. R. moved for summary judgment dismissing the action. The trial court granted the motion and entered summary judgment, based upon a review, as is stated, of the " * * * pleadings, depositions, affidavits, and other evidence, both oral and documentary, * * *" the court concluding that " * * * there is no genuine issue as to any material fact, that the plaintiff, John A. Williamson, voluntarily assumed the risk of the injuries complained of herein. * * *"

Contrary to the language contained in the judgment, there is no showing that material other than the pleadings, depositions, and an affidavit were before the trial court for its consideration in granting the summary judgment. Williamson has appealed from the summary judgment. We affirm.

Williamson asserts that the trial court erred in determining, as a matter of law, that he had assumed the risk of injuries for which he sought damages. In substance, it is his position that genuine issues of material fact exist which must be submitted to and resolved by the trier of facts and consequently precluded entry of summary judgment.

The question, consequently, on this appeal is whether there is a genuine issue as to any material fact presented by the matter considered by the court upon the motion for summary judgment, namely, the pleadings, the depositions, and Williamson's affidavit. This issue must be considered from the standpoint of whether Williamson (1) knew the place where he was working was unsafe; (2) appreciated the danger, and (3) voluntarily assumed the risk. Reed v. Styron, 69 N.M. 262, 365 P.2d 912 (1961); Padilla v. Winsor, 67 N.M. 267, 354 P.2d 740 (1960); Dempsey v. Alamo Hotels, Inc., 76 N.M. 712, 418 P.2d 58 (1966).

We note here that Williamson, in addition to challenging the trial court's conclusion relating to the assumption of risk, likewise argues that the trial court erred in determining as a matter of law that he was guilty of contributory negligence. We do not consider this latter argument for the reason that the summary judgment, which we affirm, relates only to assumption of risk.

The trial court, when confronted with a motion for summary judgment must determine whether there is a genuine issue of material fact warranting submission of the case to the trier of facts. Zengerle v. Commonwealth Insurance Company of N. Y., 60 N.M. 379, 291 P.2d 1099 (1955).

It is fundamental that issues of fact are not to be decided on motions for summary judgment and such motion should be denied unless the court is convinced from all matters before it that the moving party is entitled to judgment as a matter of law. Wieneke v. Chalmers, 73 N.M. 8, 385 P.2d 65 (1963); Butcher v. Safeway Stores, Inc., 78 N.M. 593, 435 P.2d 212 (Ct.App.1967).

It is likewise fundamental that on appeal from a summary judgment testimony will be reviewed in the most favorable aspect it will bear in support of the right to trial. Cortez v. Martinez, 79 N.M. 506, 445 P.2d 383 (1968). The defense of assumption of risk becomes a question of law where the evidence will support but one legitimate inference. Stewart v. Barnes, 80 N.M. 102, 451 P.2d 1006 (Ct.App.1969).

The issue as to whether a servant assumed the risk of injury is ordinarily a fact question to be determined by the trier of facts and is always so where reasonable men might draw different conclusions from the evidence, although when one inference only is deducible therefrom the question is for the court. See Crawford v. Western Clay & Gypsum Products Company, 20 N.M. 555, 151 P. 238 (1915).

It is undisputed that Williamson was an experienced plumber and had worked in the particular trench for a distance of some 300 feet above the place where the accident occurred and throughout this area he had encountered the problem of sand sloughing off in the ditch. He said: " * * * It crawled in on us all the time. We had to keep it pushed back all the time."

Williamson was aware of the danger that a cave-in could result from the sloughing off of the sand from beneath the hard-packed surface dirt. He was asked "Did you ever go up to him (Smith) and say it was a hazardous situation because it (sand) was sloughing off? A. I did. I told him we should drop some plywood in there and put something in between it and if it caved in it wouldn't catch a man. They said they didn't have any plywood."

There can be no question under Williamson's statement that he knew the trench in which he was working, or called upon to work, was unsafe. His statement to Smith discloses without dispute that he appreciated the danger of a cave-in.

A further showing of Williamson's knowledge and appreciation of danger is demonstrated by the following:

"Q And you were aware of the fact that if the sand sloughed off, that the hard portion of the ditch would cave in on top of it?

A Well, now, that's something I couldn't answer for the simple reason that most of the time that crawling sand in a ditch that way will crawl in on you, you know, but that on top, nobody knows when it will turn loose.

Q So, there's always that risk?

A Yes, sir, there's that risk there.

Q You knew that risk was present?

A Yes, sir.

Q As I understand it, you would not have gone down in the ditch or worked in the ditch had it not been for the fact that you wanted to work there on that job and make some money?

A Well, I wouldn't put it that way, I just put it in the way that any working man has to work to live and I was just after a living, that's all.

I could have made just as much money on any other job as I could that one, but it's just the idea of having the job in town so you could be home with your family."

\* \* \* \* \* \*

"Q And you felt that if you refused to go down in that ditch that your employer would discharge you, is that correct?

A Yes, sir. Any time you refuse to do what the foreman tells you, you can go home."

\* \* \* \* \* \*

"Q As I understand it, you told Mr. Smith that you thought that there ought to be two pieces of plywood held apart by a two-by-four or something?

A Yes, sir.

Q Did you tell him that after he told you to go down into the ditch?

A  Well, yes, sir. We were there—whenever he was digging the ditch, we all stood there and talked about the ditch and were watching the sand in the bottom cave-in on the ditch and he said, 'you reckon it will cave?' I said, 'it could.' I says, 'if we had two pieces of ply board and put down there and put a two-by-four between them, if it did cave, then it wouldn't catch a man in there.'

Q  Who asked you if you reckoned it would cave-in?

A  Mr. Smith."

It appears to be undisputed that Williamson, as shown by his own statements, knew the place in which he was working was unsafe and that he fully appreciated the danger of the cave-in. With this knowledge and appreciation of danger he nevertheless went into the trench and continued working there until the cave-in occurred.

█ In our opinion, the elements of assumption of risk are unmistakably present and were properly so determined as a matter of law.

█ Williamson argues that the conclusion that he assumed the risk as a matter of law, is not sustainable where by reason of economic coercion or compulsion he felt compelled to accept the risk to avoid possible loss of employment. He argues that a fact question consequently was presented as to whether he had voluntarily assumed the risk. Williamson stated, as we have quoted, that he felt he would lose the particular employment if he declined to work in the trench. His affidavit also indicates that a discharge from the particular employment would prejudice his right to secure work on other projects. The rule generally followed, and which we consider applicable here, is that if a servant undertakes the performance of work, the danger of which he fully comprehends, the fact that he undertakes it through fear or threat of dismissal will not relieve him of the assumption of risk. Jasper v. Lumpee, 81 N.M. 214, 465 P.2d 97 (1970); Demarest v. T. C. Bateson Constr. Co., 370 F.2d 281 (10th Cir.1966); Gamble v. Gamble, 171 Neb. 826, 108 N.W.2d 92 (1961); Gabbard v. Sharp, 167 Kan. 354, 205 P.2d 960 (1949); Louisville & N. R. Co. v. Russell, 164 Miss. 529, 144 So. 478 (1932); Newman v. Griffin Foundry & Machine Co., 38 Ga.App. 518, 144 S.E. 386 (1928); Vol 2, Shearman and Redfield on Negligence (Revised Ed. 1941), pg. 589.

Williamson takes the position that Padilla v. Winsor, supra, is controlling here and fully supports his assertion of error on the part of the trial court.

*Padilla* was a master-servant case. Padilla was employed by Winsor as a ranch hand and was furnished two riding horses for his use; one named Elmer and one named Trigger. Padilla was informed by Winsor that both horses were gentle. He was instructed to ride one of the horses one day and the other the next, alternating them. Padilla rode both horses almost daily from August 15th, 1955 to November 21st, 1955, when he was injured as a result of being thrown from Trigger when he started bucking. Padilla preferred Trigger because Elmer was prone to stumble and he considered Trigger a better horse, gentle, and easier to handle if he had to be loaded into a pickup in the pasture.

Prior to the accident Trigger had bucked with Padilla. Relating to this incident the following testimony is quoted in the opinion.

" 'Q. Did you tell Mr. Winsor about your experience with the horse that morning and what the horse did? A. Yes, when we was driving the bunch I told Mr. Winsor that Trigger had throwed me down and we began to talk about him, and he said that he throwed him once, too, but I didn't pay much attention to the old man because Mr. Winsor used to use just one spur, and I thought that he had catched the horse with a spur and that's what make him buck, so I didn't pay much attention that the horse was mean.

'Q. But Mr. Winsor did tell you that the horse had thrown him? A. Yes, one day that he and Severda was working cattle he said that horse started bucking without reason, but I kind of jumped Mr. Winsor that he had hooked him with a spur.'"

The court appears to have taken the view that because Trigger had bucked on two previous occasions did not necessarily render him an unsafe horse. Padilla, consequently, could not as a matter of law be charged with knowing that the horse was unsafe. Judicial notice was taken of the fact " * * * that horses no matter how gentle, with slight provocation, or without any known provocation, will sometimes shy, jump or even start to buck."

The court concluded that because Padilla knew that Trigger had bucked twice before the accident was not a sufficient basis upon which to determine assumption of risk as a matter of law.

In the instant case, as we have said, Williamson knew the place provided for him to perform his work was unsafe and fully appreciated the danger; in this respect it differs from Padilla.

Williamson appears to argue that a servant does not assume any risks resulting from his continuing to work and use the instrumentality about which he has complained and is seeking to have the master remedy, citing Padilla and Vol. 2, Shearman and Redfield on Negligence, (Revised Ed.1941), pg. 589.

This rule, in our opinion, is not applicable here because, although Williamson did complain about the unsafe condition of the trench and did seek to have a protective device installed he was told that such device would not be provided.

The fact that a servant has complained of an unsafe condition does not relieve him of the assumption of risk in the absence of an assurance or promise, express or implied, by the master that the condition will be remedied. See Hallstein v. Pennsylvania R. Co., 30 F.2d 594 (6th Cir.1929); Western Arkansas Telephone Co. v. Grantham, 200 Ark. 411, 139 S.W.2d 49 (1940); McDaniel v. Myers, 156 Kan. 21, 131 P.2d 650 (1942); Liptak v. Karsner, 208 Minn. 168, 293 N.W. 612 (1940); Mobile & O. R. Co. v. Clay, 156 Miss. 463, 125 So. 819 (1930), Certiorari denied Clay v. Mobile & O. R. Co., 282 U.S. 844, 51 S.Ct. 24, 75 L. Ed. 749 (1930); Ducjack v. New Jersey Zinc Co., 104 N.J.L. 575, 141 A. 791 (1928).

Williamson further argues that he " * * * knew deep ditches in sandy soil could be dangerous but nevertheless undertook to work in the one in which he was injured. However, * * * he didn't know this ditch was going to cave in. * * *" He says that this situation cannot be distinguished from Padilla.

As we have stated, it is the appreciation of the danger that the ditch could cave in which supplies an element of assumption of risk rather than a knowledge that the ditch was, in fact, going to cave in. We do not read Padilla as requiring a contrary holding.

We conclude that no genuine issue of material fact was present which precluded the entry of summary judgment and the entry of the summary judgment was proper. The judgment is affirmed.

It is so ordered.

HENDLEY, J., and BLYTHE, District Judge, concur.